**Volume 1 of 2**

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

VERIZON MARYLAND, INCORPORATED,
*Plaintiff-Appellant,*

v.

GLOBAL NAPS, INCORPORATED; THE PUBLIC SERVICE COMMISSION OF MARYLAND; TCG-MARYLAND,
*Defendants-Appellees,*

UNITED STATES OF AMERICA,
*Intervenor/Defendant-Appellee,*

and

MCIMETRO ACCESS TRANSMISSION SERVICES, LLC; AMERICAN COMMUNICATIONS SERVICES OF MARYLAND, INCORPORATED, d/b/a E.Spire Communications, Incorporated; MARYLAND OFFICE OF PEOPLE'S COUNSEL; MCI WORLDCOM COMMUNICATIONS, INCORPORATED, formerly known as MFS Intelenet of Maryland, Incorporated; RCN TELECOM COMMUNICATIONS, LLC; GLENN F. IVEY, in his official capacity as Chairman of the Public Service Commission of Maryland; CLAUDE M. LIGON, in his official capacity as Commissioner of the Public Service Commission of Maryland;

No. 03-1448

E. MASON HENDRICKSON, in his
official capacity as Commissioner
of the Public Service Commission
of Maryland; SUSAN BROGAN, in her
official capacity as Commissioner
of the Public Service Commission
of Maryland; CATHERINE I. RILEY, in
her official capacity as
Commissioner of the Public Service
Commission of Maryland; CORE
COMMUNICATIONS, INCORPORATED; J.
JOSEPH CURRAN, III, in his official
capacity as Commissioner of the
Public Service Commission of
Maryland; GAIL C. MCDONALD, in
her official capacity as
Commissioner of the Public Service
Commission of Maryland; RONALD
A. GUNS, in his official capacity as
Commissioner of the Public Service
Commission of Maryland; HAROLD
WILLIAMS,

*Defendants.*

VERIZON MARYLAND, INCORPORATED,
*Plaintiff-Appellee,*

v.

THE PUBLIC SERVICE COMMISSION OF
MARYLAND; CATHERINE I. RILEY, in
her official capacity as
Commissioner of the Public Service
Commission of Maryland;

No. 03-1449

J. JOSEPH CURRAN, III, in his official capacity as Commissioner of the Public Service Commission of Maryland; GAIL C. MCDONALD, in her official capacity as Commissioner of the Public Service Commission of Maryland; RONALD A. GUNS, in his official capacity as Commissioner of the Public Service Commission of Maryland; HAROLD WILLIAMS,

*Defendants-Appellants,*

GLOBAL NAPS, INCORPORATED; TCG-MARYLAND,

*Defendants-Appellees,*

UNITED STATES OF AMERICA,
*Intervenor/Defendant-Appellee,*

and

MCIMETRO ACCESS TRANSMISSION SERVICES, LLC; AMERICAN COMMUNICATIONS SERVICES OF MARYLAND, INCORPORATED, d/b/a E.Spire Communications, Incorporated; MARYLAND OFFICE OF PEOPLE'S COUNSEL; MCI WORLDCOM COMMUNICATIONS, INCORPORATED, formerly known as MFS Intelenet of Maryland, Incorporated; RCN TELECOM SERVICES OF MARYLAND, INCORPORATED; STARPOWER COMMUNICATIONS, LLC;

GLENN F. IVEY, in his official capacity as Chairman of the Public Service Commission of Maryland; CLAUDE M. LIGON, in his official capacity as Commissioner of the Public Service Commission of Maryland; E. MASON HENDRICKSON, in his official capacity as Commissioner of the Public Service Commission of Maryland; SUSAN BROGAN, in her official capacity as Commissioner of the Public Service Commission of Maryland; CORE COMMUNICATIONS, INCORPORATED,
*Defendants.*

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Senior District Judge.
(CA-99-2061-S)

Argued: December 4, 2003

Decided: August 2, 2004

Before NIEMEYER, MICHAEL, and GREGORY, Circuit Judges.

Reversed and remanded in part, affirmed in part, and dismissed in part by published opinion. Judge Michael wrote the opinion, in which Judge Gregory joined. Judge Niemeyer wrote a separate opinion, concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Aaron M. Panner, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C., for Appellant. Susan

Stevens Miller, General Counsel, PUBLIC SERVICE COMMISSION OF MARYLAND, Baltimore, Maryland; Charles Wylie Scarborough, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Donald Beaton Verrilli, Jr., JENNER & BLOCK, L.L.C., Chicago, Illinois, for Appellees. **ON BRIEF:** Mark L. Evans, Sean A. Lev, KELLOGG, HUBER, HANSEN, TODD & EVANS, P.L.L.C., Washington, D.C.; James P. Garland, MILES & STOCKBRIDGE, P.C., Baltimore, Maryland; David A. Hill, Vice President and General Counsel, VERIZON MARYLAND INC., Baltimore, Maryland, for Appellant. Gregory G. Katsas, Acting Assistant Attorney General, Thomas M. DiBiagio, United States Attorney, Mark B. Stern, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; John J. Hamill, John R. Harrington, Steven J. Winger, JENNER & BLOCK, L.L.C., Chicago, Illinois; William Single, IV, MCI, Washington, D.C.; Russell M. Blau, Michael W. Fleming, SWIDLER, BERLIN, SHEREFF, FRIEDMAN, L.L.P., Washington, D.C.; James R.J. Scheltema, Director, Regulatory Affairs, GLOBAL NAPS, INC., Pensacola, Florida; William J. Rooney, GLOBAL NAPS, INC., Quincy, Massachusetts; Matthew W. Nayden, OBER, KALER, GRIMES & SHRIVER, Baltimore, Maryland; Michael A. McRae, AT&T, Oakton, Virginia, for Appellees.

---

## OPINION

MICHAEL, Circuit Judge:

This case arises from the regulatory scheme created by the Telecommunications Act of 1996 (1996 Act or Act), Pub. L. 104-104, 110 Stat. 56, to promote competition in local telephone markets. It is now before us for the second time after a remand by the Supreme Court. The main question today is this: whether a federal court has jurisdiction over a local carrier's claim that a state utility commission misinterpreted interconnection agreement provisions on reciprocal compensation that are based on federal law. We hold that there is federal question jurisdiction under 28 U.S.C. § 1331. We also hold that the state utility commission had the authority under federal law to impose reciprocal compensation terms in arbitration proceedings. We

reject the state commissioners' arguments that the regulatory scheme in the 1996 Act violates the Tenth Amendment, that the incumbent local carrier's amended complaint fails to state a claim, and that the action was not filed on a timely basis. The case will be remanded for further proceedings on the incumbent local carrier's contract misinterpretation claim.

I.

A.

Before the Telecommunications Act of 1996 came along, telephone service in a local calling area was provided by a single local exchange carrier (local carrier), operating as a state-licensed monopoly. The 1996 Act ended the monopoly system and opened local telephone markets to competition. Congress, of course, recognized that a new carrier would not be able to break into a local market if it had to bear the prohibitive costs of building an entire telephone network. *See MCI Telecomm. Corp. v. Bell Atl.-Pa.*, 271 F.3d 491, 498 (3d Cir. 2001). Section 251 of the Act therefore requires an incumbent local carrier to share its network and services, on reasonable rates and terms, with a competing carrier seeking to enter a local telephone market. 47 U.S.C. § 251.

A competing carrier may enter a local market by interconnecting with the network of the incumbent local carrier. Interconnection allows "for the transmission and routing of telephone exchange service and exchange access." *Id.* § 251(c)(2)(A). The duty to interconnect is coupled with other duties set forth in § 251, including the "duty [of all local carriers] to establish reciprocal compensation arrangements for the transport and termination" of telephone calls. *Id.* § 251(b)(5). The FCC by regulation has limited the reciprocal compensation requirement to local traffic. 47 C.F.R. § 51.701(a) (1996). Thus, when a customer of local carrier A places a call to a customer of local carrier B in the same local exchange area, carrier A pays carrier B for completing the call, usually on a per-minute basis; when the direction is reversed, carrier B pays carrier A for completing the call.

The terms under which two competing local carriers interconnect their networks and provide for reciprocal compensation are set forth

in an interconnection agreement. The Act requires both parties to negotiate in good faith in an effort to reach agreement. 47 U.S.C. § 251(c)(1). If the parties fail to reach agreement, § 252 allows the state utility commission to resolve disputed issues through compulsory arbitration. *Id.* § 252(c)(1). The resulting agreement, whether arrived at through negotiation or arbitration, must be submitted to the state commission for approval. *Id.* § 252(e). (If a state commission fails to assume this role, the FCC must step in and fill it. *Id.* § 252(e)(5).) Any party aggrieved by a state commission's determination under § 252 of the Act may bring an action in federal district court "to determine whether the [interconnection] agreement . . . meets the requirements" of § 251 and § 252 of the Act. *Id.* § 252(e)(6).

B.

When the Act went into effect in 1996, Verizon (then called Bell Atlantic Maryland, Inc.) was providing local telephone service in Maryland. As the incumbent local carrier, Verizon proceeded to negotiate an interconnection agreement with a competing local carrier, MFS Intelenet of Maryland, Inc. (We will refer to MFS Intelenet in the name of its successor, MCI WorldCom, Inc. (MCI).) The agreement, signed in July 1996 and approved by the Maryland Public Service Commission (PSC) in October 1996, required the payment of reciprocal compensation "for transport and termination of Local Traffic." J.A. 76. After Verizon and MCI negotiated their interconnection agreement, Verizon entered into substantively identical agreements with certain other competing local carriers. The later interconnection agreements were also approved by the PSC.

A dispute soon arose between Verizon and MCI over whether Verizon had to pay MCI reciprocal compensation for calls Verizon customers made to the local numbers of internet service providers (ISPs) that were MCI customers. Verizon claimed that these ISP-bound calls are not local traffic because ISPs connect their calls to distant internet websites. The issue comes up for a simple reason: ISP-bound traffic goes in one direction; the customers call the ISPs, but the ISPs do not call back. This means that the reciprocal compensation for these calls also flows in one direction, to the local carriers completing the calls to the ISPs. This situation, Verizon says, has provided a windfall for

competing local carriers that focus on serving ISPs for the purpose of collecting reciprocal compensation on this one-directional traffic.

In April 1997 Verizon stopped paying MCI reciprocal compensation for local exchange calls to ISPs served by MCI. No reciprocal compensation was due, Verizon said, because the 1996 Act and the interconnection agreement treat these ISP-bound calls as non-local. In May 1997 MCI filed a complaint with the Maryland PSC, alleging that Verizon's refusal to pay reciprocal compensation violated the 1996 Act and the interconnection agreement. The PSC ruled against Verizon in September 1997, holding that ISP-bound calls are local and ordering Verizon to pay reciprocal compensation to MCI on these calls. The PSC noted that it would reconsider its order if the FCC, which was considering how to treat ISP-bound calls, issued a decision that resolved the issue. Before any word came from the FCC, the PSC considered the issue a second time when Verizon in late 1998 refused to sign an interconnection agreement with Sprint Communications Company, LP (Sprint) unless it provided that ISP-bound traffic did not require the payment of reciprocal compensation. Sprint, invoking § 252(b)(1) of the Act, petitioned the PSC to arbitrate this issue, and the PSC again concluded that these calls are local and subject to reciprocal compensation.

In February 1999 the FCC issued a ruling that classified ISP-bound calls as non-local calls that do not qualify for reciprocal compensation under § 251(b)(5). *In the Matter of Implementation of the Local Competition Provisions in the Telecommun. Act of 1996*, 14 F.C.C.R. 3689 (1999) (*ISP Order No. 1*), *vacated*, *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000). In reaching this decision, the FCC looked at the starting and ending points of the calls and concluded that they terminate not with the ISP, but at the websites eventually accessed by the internet user. *ISP Order No. 1* at ¶ 12. The Commission said, however, that "pending adoption of [an FCC] rule establishing an appropriate interstate compensation mechanism," it had "no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic." *Id.* at ¶ 21. Likewise, the FCC said, when the parties could not voluntarily agree on a compensation mechanism for ISP-bound traffic, state commissions "may determine in their arbitration

proceedings *at this point* that reciprocal compensation should be paid for this traffic." *Id.* at ¶ 25 (emphasis added).

Verizon immediately petitioned the Maryland PSC to reconsider its earlier orders, arguing that the FCC's *ISP Order No. 1* meant that Verizon no longer had to pay reciprocal compensation for ISP-bound calls. The PSC denied Verizon relief in an order issued on June 11, 1999. In reaffirming its decision interpreting the Verizon-MCI agreement, the PSC noted that *ISP Order No. 1* did not prohibit it from ordering reciprocal compensation under the terms of a negotiated interconnection agreement. In reaffirming its order in the Sprint-Verizon arbitration, the PSC noted that the FCC was allowing state commissions, in arbitration proceedings, to require reciprocal compensation on ISP-bound calls as an "'*interim* inter-carrier compensation rule' pending completion of FCC rulemaking on this issue." J.A. 58 (quoting *ISP Order No. 1* at ¶ 27). Later, on February 10, 2000, in an arbitration proceeding between MCI and Verizon, the PSC (relying on its June 11, 1999, order) imposed terms requiring the payment of reciprocal compensation on ISP-bound traffic.

In March 2000 the D.C. Circuit vacated *ISP Order No. 1* and rejected the FCC's end-to-end analysis as a basis for classifying the calls. *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000). On remand in April 2001, the FCC, using a different reason, again exempted ISP-bound calls from reciprocal compensation. *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic*, 16 F.C.C.R. 9151, ¶ 31 (2001) (*ISP Order No. 2*). This time the FCC determined that ISP-bound traffic was a form of "information access" that qualified under § 251(g) for an exemption from § 251(b)(5)'s reciprocal compensation obligation. Recognizing, however, that some form of compensation for delivering ISP-bound calls was necessary, the FCC established a new payment system for these calls, a "bill-and-keep" system, under which each carrier recovers its costs from its own customers. The new system was to take effect on June 14, 2001, and was to be implemented only as existing interconnection agreements expire. The FCC did not disturb state commission decisions issued before June 14, 2001, that required reciprocal compensation for ISP-bound traffic. *Id.* at ¶ 82. When *ISP Order No. 2* was challenged in the D.C. Circuit, the court held that § 251(g) did

not provide a basis for the FCC's decision. Without vacating the FCC's order, the court remanded the case to allow the agency to come up with a sustainable basis for the new compensation system. *See WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002).

Meanwhile, in July 1999 Verizon filed this action in federal court to review the Maryland PSC's June 11, 1999, order that required Verizon to pay reciprocal compensation to competing local carriers for delivering ISP-bound traffic. Named as defendants were the PSC, its individual commissioners in their official capacities, MCI, and other competing local carriers. District court jurisdiction was invoked under 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331. Verizon sought declaratory and injunctive relief, alleging that the PSC's order violated the 1996 Act, the FCC's (not yet vacated) *ISP Order No. 1*, and the interconnection agreement. (Like the parties, we refer to "interconnection agreement" in the singular because the agreements between Verizon and the competing carriers have substantially similar terms.) The district court dismissed the action, and we affirmed on the ground that neither 47 U.S.C. § 252(e)(6) nor 28 U.S.C. § 1331 provides a basis for federal jurisdiction. *Bell Atlantic Md., Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279 (4th Cir. 2001). The Supreme Court took the case and vacated our decision. *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635 (2002). The Court concluded that Verizon's claim that the PSC's order was barred by federal law fell within § 1331's "general grant of jurisdiction." *Id.* at 643. Although the Court declined to reach the issue of whether § 252(e)(6) provided an alternative basis of jurisdiction, it emphasized that "nothing in 47 U.S.C. § 252(e)(6) purports to strip [§ 1331] jurisdiction." *Id.* Section 252(e)(6), the Court said, "does not even mention subject-matter jurisdiction, but reads like the conferral of a private right of action." *Id.* at 644. The case was sent back to us.

Following our remand to district court, Verizon filed an amended complaint that, among other changes in parties, dropped the PSC as a defendant and substituted as defendants new PSC commissioners for their predecessors. Count I alleged that the PSC's June 11, 1999, order classifying ISP-bound calls as local traffic violated "federal law and . . . the language of [the interconnection] agreement[]." J.A. 40. Count II alleged that the PSC lacked the authority to require reciprocal compensation in arbitration proceedings. The district court pro-

ceeded by first denying the PSC commissioners' motion to dismiss made on the grounds (1) that the 1996 Act violates the Tenth Amendment and (2) that Verizon's amended complaint did not state a claim. *See Verizon Md. Inc. v. RCN Telecom Servs. of Md. Inc.*, 232 F. Supp. 2d 539 (D. Md. 2002). The district court then decided the parties' cross-motions for summary judgment. *See Verizon Md. Inc. v. RCN Telecom Servs. of Md. Inc.*, 248 F. Supp. 2d 468 (D. Md. 2003). In its summary judgment decision the district court recognized its jurisdiction over Count II of Verizon's amended complaint, which it regarded as a "garden-variety federal preemption claim," and held that federal law did not prohibit the PSC from imposing reciprocal compensation terms in an arbitration proceeding. *Id.* at 476, 486-87. The Court therefore awarded summary judgment on Count II to the defendants (the competing carriers and the PSC commissioners). *Id.*

On Count I the district court first determined that Verizon was actually asserting two distinct claims: first, that the PSC's interpretation of the interconnection agreement violated federal law; and second, that the PSC's interpretation violated the parties' intent as reflected in the agreement. The court took jurisdiction over the first claim and awarded summary judgment to the defendants. Then, the court held that neither § 252(e)(6) nor § 1331 supported jurisdiction over the remaining claim, which it construed as a contract misinterpretation claim arising under state law. *Id.* at 487. The court declined to exercise supplemental jurisdiction over this claim and dismissed it. *See* 28 U.S.C. § 1367(a). Verizon and the PSC commissioners appeal.

II.

Verizon appeals two issues from the district court's summary judgment order. First, Verizon argues that the district court erred in holding that there is no federal jurisdiction over its claim that the PSC misinterpreted the interconnection agreement. Second, Verizon challenges the district court's determination that federal law did not prohibit the PSC from imposing reciprocal compensation terms in arbitration proceedings. We consider each issue in turn.

## A.

### 1.

The district courts have original jurisdiction in all "civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. There is no "single, precise definition" of what it means for an action to "arise under" federal law. *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 8 (1983)). The Supreme Court has recognized § 1331 jurisdiction in a variety of cases, such as (1) when a federal right or immunity forms an essential element of the plaintiff's claim, *Gully v. First Nat'l Bank in Meridian*, 299 U.S. 109, 112 (1936); (2) when a plaintiff's "right to relief depends upon the construction or application" of federal law, and the federal nature of the claim "rests upon a reasonable foundation," *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180, 199 (1921); (3) when "federal law creates the cause of action," *Merrell Dow*, 478 U.S. at 808; and (4) when "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law," *Franchise Tax Board*, 463 U.S. at 28. One commentator has suggested that the various Supreme Court statements boil down to the principle that federal jurisdiction exists when a plaintiff has "a substantial claim founded 'directly' upon federal law." Paul J. Mishkin, "The Federal 'Question' in the District Courts," 53 Colum. L. Rev. 157, 165 (1953). *See also Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc.*, 272 F.3d 912, 915 (7th Cir. 2001) (stating that "Professor Mishkin's appraisal remains apt"). The Supreme Court has shied away from a rigid test for § 1331 jurisdiction because "the phrase 'arising under' masks a welter of issues regarding the interrelation of federal and state authority and the proper management of the federal judicial system." *Merrell Dow*, 478 U.S. at 808 (quoting *Franchise Tax Bd.*, 463 U.S. at 8). For example, when a federal court "explor[es] the outer reaches of § 1331," it must make "sensitive judgments about congressional intent, judicial power, and the federal system." *Merrell Dow*, 478 U.S. at 810. *See also Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 806-07 (4th Cir. 1996).

In all events, the question of whether a claim arises under federal law begins with a look at "the face of the plaintiff's properly pleaded

complaint." *Caterpillar v. Williams*, 482 U.S. 386, 392 (1987). In this case, we also consider whether the claim involves an agreement and duties that are creations of federal law and whether the purpose of the underlying statute (the 1996 Act) is best served by the exercise of federal judicial power. These considerations lead us to conclude, as we explain below, that Verizon's contract interpretation claim arises under federal law within the meaning of § 1331.

We turn first to Verizon's amended complaint, which challenges the PSC's determinations that Verizon must pay reciprocal compensation on ISP-bound traffic. Count I alleges that the "PSC's decision that Internet communications constitute 'local traffic' within the meaning of the [interconnection] Agreement is inconsistent with federal law and the language of [the] agreement[]." J.A. 40. As the district court reasonably determined, Verizon is asserting two distinct claims in Count I: first, that the PSC's interpretation of the interconnection agreement violated federal law; and second, that the PSC misinterpreted the language of the agreement. The district court erred, however, in concluding that the second of these claims — alleging misinterpretation of the agreement — was an ordinary state-law contract claim.

Verizon begins the central allegations of its amended complaint by stating that the purpose of the interconnection agreement is "[t]o implement the substantive duties" imposed by the 1996 Act, including "the dut[y] to establish reciprocal compensation arrangements for local traffic." J.A. 35. Pertinent pages of the agreement are attached to Verizon's amended complaint and are therefore a part of that pleading. *See* Fed. R. Civ. P. 10(c). The agreement contains key provisions on reciprocal compensation that refer directly to federal law. To begin with, the agreement provides that "'Reciprocal Compensation' is *As Described in the Act*, and refers to the payment arrangements that recover costs incurred for the transport and termination of Local Traffic originating on one Party's network and terminating on the other Party's network." J.A. 73 (emphasis added). "As Described in the Act" means "as described in or required by the Act and as from time to time interpreted in the duly authorized rules and regulations of the FCC or the [PSC]." J.A. 67. Finally, the interconnection agreement defines "Local Traffic" in a manner that corresponds to the then-existing FCC regulation, 47 C.F.R. § 51.701(b)(1)(1996): local traffic

is that originating on one party's network and terminating on another's "within a given local calling area," based on the "actual originating and terminating points of the complete end-to-end call." J.A. 71, 77. Thus, according to Verizon's complaint, whether it must pay reciprocal compensation on ISP-bound traffic *under the terms of the agreement* depends in substantial measure upon the requirements of the Act and the FCC's regulations and interpretations. On its face, then, Verizon's contract claim is tied directly to federal law, and its asserted basis in federal law is not "insubstantial [or] frivolous." *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 89 (1998).

Whether Verizon's contract claim is substantially federal also depends on the nature and purpose of the contract, an interconnection agreement. Here, we are guided by *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682 (1963), which held that a suit to enforce a contract required by the Railway Labor Act raised a federal question under 28 U.S.C. § 1331. Section 204 of the Railway Labor Act required every airline and its employees (through their union) to establish a board of adjustment to decide employee grievances. The statutory duty to create the board was implemented by contract. When the union and several employees sued an airline in federal court to enforce the award of an adjustment board, the Fifth Circuit affirmed the dismissal of the complaint, saying that the "suit was nothing more than a state-created action to construe a contract." *Id.* at 684 (internal quotation marks omitted). The Supreme Court reversed. The Court explained that "[i]f these contracts [creating the adjustment boards] are to serve their function under [the Railway Labor Act], their *validity, interpretation, and enforceability* cannot be left to the laws of the many States." *Id.* at 691 (emphasis added). Because both the contract and the adjustment board it established "are creations of federal law" and are "therefore governed and enforceable by federal law," the district court had jurisdiction over the enforcement action under § 1331. *Id.* at 692.

An interconnection agreement is likewise a "creation of federal law," specifically, the 1996 Act. As one court has said, interconnection agreements are the "tools through which [the 1996 Act] is [implemented and] enforced." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1278 (11th Cir. 2003) (en banc). The Act requires an incumbent local carrier and its

aspiring competitor to enter into an interconnection agreement that sets forth the "terms and conditions . . . to fulfill the duties" mandated by § 251(b) and § 251(c) of the Act. 47 U.S.C. § 251(c)(1). One duty mandated by § 251(b) is at issue here, the "duty [of local carriers] to establish reciprocal compensation arrangements for the transport and termination" of calls. *Id.* § 251(b)(5). If the parties enter into an agreement by voluntary negotiation, they may agree "without regard to the standards set forth" in § 251(b) and § 251(c). *Id.* § 252(a)(1). They must still, however, spell out how they will fulfill the duties imposed by § 251. *See id.* § 251(c)(1). When an agreement, like the one voluntarily negotiated by Verizon and MCI, is submitted to the state commission for approval, the commission may reject it only if it discriminates against a carrier not a party, or it is not consistent with "the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). Once the agreement is approved, the 1996 Act requires the parties to abide by its terms. *See* §§ 251(b)-(c).

Interconnection agreements are thus the vehicles chosen by Congress to implement the duties imposed in § 251. They are, in short, federally mandated agreements, and "[t]o the extent [an agreement] imposes a duty consistent with the Act . . . that duty is a federal requirement." *Central Airlines*, 372 U.S. at 695. The contractual duty at issue in this case — to pay reciprocal compensation "for transport and termination of Local Traffic" — is a duty imposed by the 1996 Act. The scope of this duty is at the heart of Verizon's contract claim, and the resolution of that claim depends on the interpretation and application of federal law. *Smith v. Kansas City Title & Trust Co.*, 255 U.S. at 199; *Ormet*, 98 F.3d at 807.

Finally, we recognize that "[t]he determination of whether a federal issue is sufficiently substantial should be informed by . . . whether the [exercise] of federal judicial power is both appropriate and pragmatic." *Ormet*, 98 F.3d at 807. *See also*, *Merrell Dow*, 808 U.S. at 808-09. This area of consideration takes us to the basic purpose of the 1996 Act. As the Supreme Court said, the Act took "the regulation of local [telephone service] away from the States" and established "a new *federal* regime" designed to promote competition. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999) (emphasis in original). State utility commissions have a role in this regime, but that role is subject to federal oversight. Here, the PSC interpreted an intercon-

nection agreement mandated by the Act. Because the agreement and the specific duty (reciprocal compensation) it incorporates have a direct connection to the Act, the purpose of the Act is best served by subjecting the PSC's contract interpretation decision to federal review in the district court. *See BellSouth Telcomms., Inc. v. MCIMetro Access Trans. Servs., Inc.*, 317 F.3d 1270, 1278 (11th Cir. 2003) (en banc).

2.

The dissent argues that there is no § 1331 jurisdiction over Verizon's contract interpretation claim because "[t]he federal interest in the content of local carriers' voluntarily negotiated reciprocal-compensation terms is negligible." *Post* at 63. The interest is negligible, the dissent says, because there is "authority to negotiate terms without regard to" the standards mentioned in 47 U.S.C. § 251(b) and (c). *Post* at 59. This line of argument, we respectfully suggest, overlooks how important reciprocal compensation is to the Act's central purpose of promoting competition in local telephone markets. The Act imposes five duties on "[e]ach local carrier," and one of these duties is "to establish reciprocal compensation arrangements for the transport and termination of" local traffic. 47 U.S.C. § 251(b)(5). The fulfillment of this duty is essential to the Act's pro-competitive design, which requires local carriers to complete calls for each other. Thus, even when the "reciprocal compensation arrangements" are spelled out in an interconnection agreement that is voluntarily negotiated, there is a substantial federal interest in those arrangements. Moreover, in this case the interconnection agreement incorporates key provisions of federal law in delineating the compensation arrangements or duties.[1]

---

[1]We do not miss the point of the dissent's argument against § 1331 jurisdiction, which is that the parties' latitude to negotiate reciprocal compensation terms means that there is no federal interest in the determination "whether [they] reached agreement on treating [ISP-bound] calls as local calls eligible for reciprocal compensation." *Post* at 59-60 n.9. The dissent's focus is much too narrow. The jurisdictional analysis must take into account the broader federal interest; it must recognize that the interconnection agreement and the duties specified therein, including the duty to arrange for reciprocal compensation, have the imprimatur of federal law. *See Central Airlines*, 372 U.S. at 692. Even though the Act allows flexibility in the contractual terms negotiated for carrying out the reciprocal compensation duty, the duty is still a key federal requirement.

The dissent relies on *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union*, 457 U.S. 15 (1982), to support its argument that Verizon's contract misinterpretation claim cannot be brought in federal court. *Jackson Transit* is readily distinguishable. That case involves § 13(c) of the Urban Mass Transportation Act of 1964 (UMTA), 78 Stat. 307 (codified as amended, 49 U.S.C. §§ 5301-5338), which requires a state or local government to make arrangements to preserve the existing collective bargaining rights of transit workers before the governmental body may receive federal monies to acquire a privately owned transit company. When a transit union sued a city in federal court for breach of a § 13(c) agreement, the Supreme Court held there was no federal question jurisdiction. The Court began its analysis by noting that "labor relationships between local governments and their employees are the subject of a longstanding statutory exemption from the National Labor Relations Act." *Jackson Transit*, 457 U.S. at 23. And, after considering the legislative history of § 13(c), the Court concluded that "Congress intended those contracts [between transit workers and local governments] to be governed by state law applied in state courts." *Id.* at 29. This holding sets *Jackson Transit* apart from the 1996 Act and this case. Unlike § 13(c) of the UMTA, which did *not* "substitute a federal law of collective bargaining for state labor law," *id.* at 28, the Telecommunications Act of 1996 removed the regulation of local telephone markets "from the States' exclusive control" and substituted a federally prescribed regulatory program. *Iowa Utils. Bd.*, 525 U.S. at 381 n.8. Again, federally mandated duties, including the duty to pay reciprocal compensation, are the backbone of the new program. As a result, when there is a claim that a state utility commission has misinterpreted an interconnection agreement provision that implements a duty imposed by the Act, review should be available under § 1331 in district court. We are not saying that every dispute about a term in an interconnection agreement belongs in federal court, but when the contractual dispute (like the one here) involves one of the 1996 Act's essential duties, there is a federal question.

3.

In sum, because (1) Verizon's complaint alleges that the PSC misinterpreted interconnection agreement provisions that incorporate federal law, (2) the agreement interpreted is federally mandated, (3) the

contractual duty at issue is imposed by federal law, and (4) the purpose of the 1996 Act is best served by allowing review of the PSC's order in the district court, we hold that Verizon's contract claim in Count I raises a substantial question of federal law. The claim therefore arises under federal law, conferring jurisdiction in the district court under 28 U.S.C. § 1331.[2]

B.

Verizon next challenges the district court's grant of summary judgment to the defendants on Count II, which alleges that "the PSC's decision to require reciprocal compensation for [ISP-bound] traffic in instances [that is, in arbitration proceedings] where the parties could not agree on the rules governing compensation for such traffic violates federal law." J.A. 40. We affirm because the 1996 Act authorizes the PSC to arbitrate open issues on reciprocal compensation, and the FCC has declared that state commissions had the authority to require reciprocal compensation for ISP-bound traffic in arbitrations conducted during the time frame involved in this case.

First of all, the Act expressly authorizes state commissions to impose reciprocal compensation requirements in § 252 arbitration proceedings. In resolving "any open issues" between parties negotiating an interconnection agreement, a state commission must ensure that the resolution meets the requirements of § 251. 47 U.S.C. §§ 252(b)(1), 252(c)(1). Section 251(b)(5), of course, imposes the requirement "to establish reciprocal compensation arrangements."

One arbitration order that Verizon complains about is the PSC's Sprint-Verizon order of February 9, 1999, that imposed terms requiring Verizon to pay reciprocal compensation for ISP-bound calls. At the time the PSC issued the Sprint-Verizon order, the FCC was treating ISP-bound calls "as though [they] were local," J.A. 49, and the PSC therefore concluded that these calls were subject to reciprocal compensation from Verizon. The PSC reconsidered this decision after the FCC, on February 26, 1999, issued its *ISP Order No. 1*, classifying ISP-bound calls as non-local. In the order issued on June 11,

---

[2]Because there is § 1331 jurisdiction, we decline to decide whether jurisdiction could be grounded independently on 47 U.S.C. § 252(e)(6).

1999, the PSC concluded that it was not required to alter its prior arbitration decision because the FCC had explicitly provided in *ISP Order No. 1* that state commissions may "'determine in their arbitration proceedings at this point that reciprocal compensation should be paid for [ISP-bound] traffic.'" J.A. 57 (citing *ISP Order No. 1* at ¶ 25). State commissions were to have this leeway pending completion of FCC rulemaking on the issue. The PSC thus decided that Verizon must continue to pay reciprocal compensation under its arbitrated agreement as an interim compensation mechanism. The PSC relied on this same reasoning on February 10, 2000, when it imposed terms requiring reciprocal compensation on ISP-bound traffic in a Verizon-MCI arbitration.

The FCC's *ISP Order No. 1* was, of course, vacated by the D.C. Circuit on March 24, 2000. *Bell Atlantic Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000). Thereafter, on April 27, 2001, the FCC issued its *ISP Order No. 2*, which remains in force because the D.C. Circuit did not vacate the order when it remanded the case for further consideration by the FCC. 16 F.C.C.R. 9151 (2001), *remanded*, *WorldCom, Inc. v. FCC*, 288 F.3d 429 (D.C. Cir. 2002). In *ISP Order No. 2* the FCC adopted a new compensation regime (bill-and-keep) to govern ISP-bound calls and announced that it was stripping state commissions of any authority to formulate the compensation regime for such calls. *See ISP Order No. 2* at ¶¶ 77-82. At the same time, the FCC explained that its order did not "preempt any state commission decision regarding compensation for ISP-bound traffic for the period *prior to the effective date [June 14, 2001] of the interim regime we adopt here*." *Id.* at ¶ 82 (emphasis added). The FCC's *ISP Order No. 2* thus expressly preserves the arbitration decisions here because they were issued before June 14, 2001.

As we said when this case was here the first time: "[i]t is hard to conceive how the Public Service Commission can be said to have perpetrated [in arbitration proceedings] an ongoing violation of federal law by following the dictates of the federal agency authorized to implement that law, especially when the charging party relies on the federal agency's interpretation as authoritative." *Bell Atlantic Md.*, 240 F.3d at 296. We affirm the district court's grant of summary judgment on Count II.

### III.

The PSC commissioners (PSC) raise three issues on cross-appeal stemming from the district court's denial of their motion to dismiss Verizon's amended complaint.

### A.

The PSC first argues that Congress, in violation of the Tenth Amendment, "has commandeered State officials to administer its federal program regulating local telephone service." PSC's Opening Br. at 15. The PSC acknowledges that states are not required to assume the regulatory responsibilities set forth in § 252 of the Act, but it points out that states must either undertake those responsibilities or relinquish the authority to regulate to the FCC. This choice, contends the PSC, amounts to unconstitutional coercion. We disagree.

When Congress brought the regulation of competition in local telephone markets under federal control in the 1996 Act, it could have placed regulatory authority exclusively with the FCC. But Congress chose a different course, giving states the option to participate in the federally prescribed regulatory scheme. That approach is permissible under the Tenth Amendment as the Supreme Court made clear in *Hodel v. Virginia Surface Mining and Reclamation Association, Inc.*, 452 U.S. 264, 289 (1981) (upholding the Surface Mining Control and Reclamation Act, a federal statute prescribing "federal minimum standards governing surface coal mining, which a State may either implement itself or else yield to a federal administered regulatory program."). Congress, of course, may not "compel the states to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). Here, however, Congress has simply required states to choose between regulating pursuant to federal standards or allowing the FCC to take over. As the district court said, "[t]he choice that § 252 offers may be (somewhat) unsavory [to the states], yet it remains a real choice." *Verizon Md. Inc.*, 232 F.Supp.2d at 558. In short, the Act is consistent with the Tenth Amendment.

### B.

The PSC next contends that the district court erred when it refused to dismiss Count I of Verizon's complaint for failure to state a claim

upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). The PSC is not making a true failure to state a claim argument. It begins by saying that because § 252(e)(6) fails to provide an express cause of action for review of a state commission's interpretation of an interconnection agreement, there is no federal jurisdiction over Count I. It then says that because there is no cause of action implied in § 252(e)(6), *see Cort v. Ash*, 422 U.S. 66 (1975), Count I does not state a claim. The PSC is committing the common error of confusing the jurisdictional issue with the issue of whether a claim is stated. *See Montana-Dakota Utilities Co. v. Northwestern Public Serv. Co.*, 341 U.S. 246, 249 (1951) ("As frequently happens where jurisdiction depends on subject matter, the question whether jurisdiction exists has been confused with the question whether the complaint states a cause of action.").

Count I states a claim upon which relief can be granted: it alleges that the PSC misinterpreted the federally mandated interconnection agreement, and Verizon seeks declaratory and injunctive relief to correct the alleged misinterpretation. Because we have held in part II.A that there is federal question jurisdiction over this claim under § 1331, we need not inquire into whether § 252(e)(6) provides a cause of action. *See Verizon*, 535 U.S. at 644. When a "case's resolution depends on resolution of a federal question sufficiently substantial to arise under federal law within the meaning of 28 U.S.C. § 1331," there is § 1331 jurisdiction even though the relevant statute does not explicitly or implicitly provide for a cause of action. *Ormet*, 98 F.3d at 806. *See also Central Airlines*, 372 U.S. 682. We therefore reject the PSC's argument that Count I's contract misinterpretation allegations do not state a claim.

### C.

Finally, the PSC argues that Verizon did not file its complaint within the period prescribed in the applicable statute of limitations. The PSC did not raise a limitations defense by way of answer or motion in district court. One defendant, Core Communications, Inc., did move to dismiss Verizon's complaint on statute of limitations grounds, and the district court concluded after full briefing that "Verizon's claim against Core [was] timely." *Verizon Md. Inc.*, 232 F. Supp. at 554. In these circumstances the PSC's failure to assert a

limitations defense in district court leads us to conclude that the issue is waived for this appeal. *See Peterson v. Airline Pilots Ass'n, Inter'l*, 759 F.2d 1161, 1164 (4th Cir. 1985); Fed. R. Civ. P. 8(c). The PSC's cross-appeal is therefore dismissed with respect to the statute of limitations issue.

## IV.

To sum up, in Verizon's appeal we reverse the district court's summary judgment order to the extent it holds there is no federal question jurisdiction over Verizon's contract misinterpretation claim, and we affirm that order to the extent it holds the PSC had the authority under federal law to impose reciprocal compensation terms in arbitration proceedings. In the PSC commissioners' cross-appeal we affirm the district court's order denying their motion to dismiss Verizon's amended complaint on Tenth Amendment grounds and for failure to state a claim, and we dismiss the commissioners' cross-appeal on the issue that Verizon's action is barred by the statute of limitations. The case is remanded for further proceedings on Verizon's contract misinterpretation claim.

*REVERSED AND REMANDED IN PART*,
*AFFIRMED IN PART, and*
*DISMISSED IN PART*

**Volume 2 of 2**

NIEMEYER, Circuit Judge, concurring in part and dissenting in part:

We are considering in this appeal only Verizon's claim that a federal court should review the Maryland Public Service Commission's order construing, under principles of Maryland contract law, the specific terms of a privately negotiated interconnection agreement between Verizon and MCI.[1] The district court ruled that this was a State law claim for which it did not have federal jurisdiction and dismissed the claim.

Expanding substantially the scope of federal jurisdiction under 28 U.S.C. § 1331, the majority reverses the district court and holds for the first time that because the negotiated agreement in this case was mandated by the Telecommunications Act of 1996 — even though the contractual terms construed by the Maryland Public Service Commission were not so mandated — Verizon's claim that the Commission misinterpreted the agreement "arises under" federal law within the meaning of § 1331.

Because this unprecedented holding opens federal courts to State law contract claims, without regard to whether federal or State law is called upon to resolve the claims, I disagree with the majority's decision, and therefore I dissent. Having considered the Telecommunications Act of 1996 ("the 1996 Act") and the Communications Act of 1934 ("the 1934 Act") (both Acts allocating adjudicatory responsibility between federal and State governments for the regulation of telecommunications) and 28 U.S.C. § 1331 (conferring jurisdiction on district courts for cases arising under federal law), I conclude that Verizon's claim that the Maryland Public Service Commission *misinterpreted the language of the interconnection agreement* under princi-

---

[1]The parties to the interconnection agreement, dated July 16, 1996, were Bell Atlantic-Maryland, Inc. and MFS Intelenet of Maryland, Inc., and by subsequent mergers and name changes, their interests are now represented by Verizon Maryland, Inc., MCI WorldCom Communications, Inc., and MCIMetro Access Transmission Services LLC. For convenience, I refer to the contracting parties as "Verizon" and "MCI." I also include in these designations the other local carriers who entered into contracts similar to the one between Verizon and MCI and whose contracts are also at issue in this case.

ples of Maryland contract law was properly dismissed by the district court as a State law claim for which the district court had no jurisdiction. I do not, however, disagree with the conclusion that the district court had § 1331 jurisdiction to consider the different claim that the Maryland Public Service Commission's interpretation of the agreement actually *violated* the 1996 Act, which is not before us on appeal.

In determining that Verizon's misinterpretation claim does not present a question of federal law, I conclude (1) that § 252(e)(6) of the 1996 Act does not provide federal-court review of the Maryland Public Service Commission's decisions *interpreting* interconnection agreements and therefore the 1996 Act and the 1934 Act defer review of such State-law decisions to State courts; and (2) that the Maryland Public Service Commission's interpretation, under principles of Maryland contract law, of negotiated language in the parties' interconnection agreement does not present a federal question reviewable in federal court under 28 U.S.C. § 1331, even though the agreement was mandated by the 1996 Act.

I concur in Parts II.B., III.A., and III.C. of the majority opinion.

## I.   Regulatory Scheme

The question in this case is not whether Verizon can obtain review of an order of the Maryland Public Service Commission ("PSC") that allegedly misinterprets Verizon's negotiated interconnection agreement. Rather, the question is whether such review is to be conducted in State court, under the traditional avenues established by State law for review of PSC orders, or in federal court, under the Telecommunications Act of 1996 or under 28 U.S.C. § 1331. While Congress clearly could have preempted all telecommunications issues under its commerce power and in the interest of national uniformity, it elected not to do so. Rather, it opted to enact a carefully allocated system of cooperative federalism to retain the resources and expertise of State public service commissions and State courts in the regulation of local telecommunications carriers and their services. It is thus essential to understand the manner in which Congress divided responsibility under the 1934 and 1996 Acts to decide the issues in this case. Therefore, before I address the specific issues in this case, I will outline the regulatory scheme enacted by Congress.

Prior to enactment of the Communications Act of 1934, 48 Stat. 1064, the States recognized that telephone service was a natural monopoly, and they generally regulated that service through State public utility commissions. The 1934 Act continued treating telephone service as a natural monopoly, but it divided regulatory responsibility between the Federal Communications Commission ("FCC"), which was designated to regulate interstate, long-distance service, and State public utility commissions, which were designated to regulate intrastate service. *See, e.g.*, 47 U.S.C. § 152(a), (b); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 360 (1986). Indeed, 47 U.S.C. § 410 created a joint federal-state board to resolve disputes over regulatory jurisdiction.

The Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified at 47 U.S.C. §§ 151-614), which is at issue in this case, *did not supplant* the 1934 Act. And importantly, it did not repeal either § 152 or § 410, which divided responsibility between the States and the federal government. Rather, the 1996 Act *amended* the 1934 Act, leaving much of the 1934 Act's structure in place. In amending the 1934 Act with the 1996 Act, however, Congress abandoned its hands-off approach to intrastate commerce and undertook to impose competition in both interstate and intrastate service. Moreover, Congress sought to facilitate the convergence of technologies in telephone service, broadcast (radio and television) service, cable service, satellite service, and other miscellaneous transmission services. Thus, by enacting the 1996 Act, Congress intended "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 stat. 56, 56 (1996). But even while pursuing these federal purposes, Congress left in place many of the traditional functions of State public utility commissions.

To continue to employ the resources and expertise of State public utility commissions, Congress elected not to raze the pre-1996 statutory structure created by the 1934 Act and build an entirely new statutory system. Rather, the 1996 Act partially flooded the existing statutory terrain with specific preempting federal requirements, carefully leaving numerous islands of State responsibility. With respect to some of these State islands, the 1996 Act mandates that State com-

missions apply federal law within their existing State procedural structures. Thus, for example, State commissions are required to apply federal requirements in arbitrating and approving federally mandated interconnection agreements. *See* 47 U.S.C. § 252(c), (e). With respect to other State islands, the Act actually conscripts State governmental agencies for federal purposes. *See, e.g.*, *id.* § 251(f) (mandating that State commissions conduct inquiries to determine whether to terminate rural telephone company exemptions); *id.* § 332(c)(7) (requiring local zoning boards to apply certain procedures in approving the siting of telecommunications towers and facilities). Still other areas that, before 1996, were left to the States are completely inundated by federal preemption, such as in the area of satellite service. *See, e.g.*, *id.* § 303(v). In some instances, preemption in the 1996 Act is deferred and conditional, to be effected on a case-by-case basis. *See, e.g.*, *id.* § 252(e)(5) (directing the FCC to issue an order "preempting the State commission's jurisdiction" of a proceeding if the State commission "fails to act to carry out its responsibility under [§ 252]"); *id.* § 253(d) (directing the FCC to "preempt the enforcement" of any State statute or regulation that has the effect of denying a carrier the ability to provide any interstate or intrastate telecommunications service).

No generalization can therefore be made about where, as between federal and State agencies, responsibility lies for decisions. The areas of responsibility are a patchwork, and the dividing lines are somewhat murky, prompting one authority to observe:

> In a mandatory if pro-forma gesture to the states, the Act declares that it does not implicitly preempt any state or local law. In 280 plus pages of text, however, implicit repeals are hardly needed. There is plenty of explicit language to construe, and abundant ambiguity about just who's in charge, on which issues. The new legislation's division of legal authority between federal and state regulators will likely be litigated for many years to come.

Peter W. Huber, et al., *The Telecommunications Act of 1996* § 1.2.12 (1996). What *is* certain is that, under the 1996 Act, Congress intended to divide responsibility between the federal government and the States, and unless it *expressly* provided for federal responsibility, it

left pre-1996 Act assignments of responsibility in place, such as by retaining 47 U.S.C. §§ 152 and 410. In § 601(c)(1) of the 1996 Act, Congress makes this point explicit:

> This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

Pub. L. No. 104-104, 110 Stat. 56, 143 (1996) (codified at 47 U.S.C. § 152 note).

To promote competition in local telephone service, the 1996 Act requires incumbent local exchange carriers ("ILECs") to provide would-be competing local exchange carriers ("CLECs") access to their facilities on reasonable and nondiscriminatory terms, and the incumbent carrier must "establish reciprocal compensation agreements [with competing carriers] for the transport and termination of telecommunications." 47 U.S.C. § 251(b). Through these reciprocal compensation arrangements, local carriers compensate each other for intercarrier calls. Thus, if a caller subscribing to local carrier A calls a subscriber to local carrier B, then local carrier B will be entitled to a share of the revenues collected from carrier A's subscriber. In providing access to its facilities, an ILEC has the duty to negotiate in good faith to provide interconnection on reasonable and nondiscriminatory terms. *Id.* § 251(c)(1)-(2).

The 1996 Act permits an ILEC and a CLEC voluntarily to negotiate an interconnection agreement "without regard to the standards set forth in subsections (b) and (c) of section 251." *Id.* § 252(a)(1). If the parties, however, choose not to negotiate their own terms or are unable to do so, the 1996 Act provides for binding arbitration administered by the applicable State public utility commission. *Id.* § 252(b). An ILEC may also file with a State commission a "statement of generally available terms," which any CLEC may adopt. *See id.* § 252(f).

Any interconnection agreement, whether negotiated or adopted by arbitration, must, under the 1996 Act, be "submitted for approval to the State Commission," which shall "approve or reject the agreement, with written findings as to any deficiencies." *Id.* § 252(e)(1). For *vol-*

*untarily negotiated* agreements, a State commission may only reject the agreement if it discriminates against other carriers or if it is "not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). A State commission may reject an *arbitrated* agreement if it does not meet the requirements of § 251 or the pricing standards set forth in § 252(d). *Id.* § 252(e)(2)(B). A State commission retains authority to enforce existing, or to impose additional, State regulations for local telecommunications, provided they are not inconsistent with the 1996 Act. *Id.* § 261(b), (c). Finally, if a "State commission fails to act to carry out its responsibility" under § 252, the FCC must issue a preemption order and thereby assume the responsibility of the State commission "with respect to the proceeding or matter." *Id.* § 252(e)(5).

In connection with all State commission decisions to enforce existing, or to impose additional, regulations of local telecommunications, existing State law for judicial review is left in place. The 1996 Act, however, designates specific State commission decisions for review in federal court:

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement or statement [of generally available terms] meets the requirements of section 251 of this title and this section.

*Id.* § 252(e)(6). And Congress made this limited federal review exclusive, providing that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section." *Id.* § 252(e)(4). Unless a State commission decision falls within the scope of § 252(e)(6), however, the 1996 Act leaves review in State court as provided by State law.

Against this regulatory scheme, we must determine in this appeal whether the decision of the Maryland Public Service Commission construing the terms of Verizon's voluntarily negotiated interconnection agreement with MCI is reviewable in State court pursuant to the generally available State law review procedures or in federal court

under either § 252(e)(6) of the 1996 Act or 28 U.S.C. § 1331. This issue is presented in the following context.

## II. Facts and Procedural History

Following enactment of the 1996 Act, Verizon and MCI voluntarily negotiated an interconnection agreement by which MCI was given access to Verizon's local facilities and by which reciprocal compensation was established. The agreement, dated July 16, 1996, was submitted to the Maryland Public Service Commission, which approved it by order dated October 9, 1996. Thereafter, other CLECs entered into similar agreements with Verizon, and the PSC also approved each of these agreements. The agreements provided for reciprocal compensation to "recover costs incurred for the transport and termination of Local Traffic originating on one Party's network and terminating on the other Party's network." As used in the agreements, "Local Traffic" referred to "traffic that is originated by a Customer of one Party on that Party's network and terminates to a Customer of the other Party on that other Party's network, within a given local calling area, or expanded . . . service area."

Nine months after entering into its agreement with MCI, Verizon wrote MCI a letter stating that it intended to discontinue payments of reciprocal compensation for local exchange traffic terminating with Internet service providers ("ISPs"). Verizon claimed that local exchange traffic delivered to ISPs was ineligible for reciprocal compensation because ISP traffic was interstate and not within the terms of the agreement. In response to Verizon's letter, MCI filed a complaint with the PSC, requesting that the commission interpret the contract between Verizon and MCI, which the PSC had earlier approved, and declare that the reciprocal compensation provisions were applicable to ISP-bound telephone calls. MCI contended that when an ISP purchases local exchange service from MCI and receives calls that originate from users of Verizon, the calls are "local traffic" as used in the interconnection agreement.

On September 11, 1997, the Public Service Commission issued a letter order in which it concluded (1) that the issue raised by MCI's complaint was "resolvable pursuant to the terms of the [Verizon-MCI] Interconnection Agreement" and (2) that MCI was entitled to recipro-

cal compensation for the ISP-bound calls. Invoking State law for review of PSC decisions, Verizon appealed the PSC's decision to the Circuit Court for Montgomery County, Maryland, and that court affirmed the PSC order. Verizon did not appeal that decision.

About a year later, the FCC issued a ruling (which was later vacated by the D.C. Circuit) declaring that ISP-bound traffic was not local traffic.[2] In response to that ruling, Verizon filed a second complaint with the PSC challenging the PSC's earlier ruling that, under the terms of the contract between Verizon and MCI, the parties were entitled to reciprocal compensation for ISP-bound traffic. The PSC issued a second order, adhering to its first order and concluding as a matter of State contract law that the Verizon-MCI agreement called for ISP-bound calls to be treated as local traffic and therefore were subject to reciprocal compensation. Specifically, the PSC stated: "At the time the interconnection agreement was entered into, ISP traffic was treated as local in virtually every respect by all industry participants" and that, given this fact, Verizon "had an obligation to negate such local treatment in the interconnection agreements it entered into by specifically excluding ISP traffic from the definition of local traffic subject to the payment of reciprocal compensation." Because Verizon did not exclude ISP traffic from the definition of local traffic,

---

[2]The FCC's order, *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-bound Traffic*, 14 FCC Rcd. 3689 (1999) ("1999 ISP Ruling"), was vacated by the D.C. Circuit in *Bell Atlantic Telephone Companies v. FCC*, 206 F.3d 1 (D.C. Cir. 2000). On remand, the FCC "reaffirmed [its] previous conclusion that traffic delivered to an ISP is predominately interstate access traffic" but modified its analysis to rely on § 251(g). *In re Implementation of the Local Competition Provision in the Telecommunications Act of 1996*, 16 FCC Rcd. 9151, 9153 (2001). The D.C. Circuit, however, found that reliance on § 251(g) was precluded "[b]ecause that section is worded simply as a transitional device, preserving various [local carrier] duties that antedated the 1996 Act until such time as the [FCC] should adopt new rules pursuant to the Act." *WorldCom, Inc. v. FCC*, 288 F.3d 429, 430 (D.C. Cir. 2001). The D.C. Circuit remanded, without vacating, the order "[b]ecause there may well be other legal bases for adopting the rules chosen by the [FCC]" for compensating ISP-bound calls. *Id.*

according to the PSC, the term "local traffic" included ISP-bound traffic.

Instead of seeking review of the PSC's second order in State court, as it had done with the first, Verizon commenced this action in the district court, contending that the PSC's ruling violated both the terms of the negotiated agreement and federal law, specifically the 1996 Act and the FCC ruling on ISP-bound traffic. The district court dismissed the action for lack of jurisdiction, *Bell Atl. Md., Inc. v. MFS Intelenet, Inc.*, Civil No. S-99-2061 (D. Md. October 20, 1999), and we affirmed, *Bell Atl. Md., Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279 (4th Cir. 2001). The Supreme Court, however, vacated our decision, concluding that the district court had jurisdiction under 28 U.S.C. § 1331 at least to the extent that Verizon's claim was that the PSC's order violated federal law. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 648 (2002). The Supreme Court stated that because the complaint charged that the PSC "violated the [1996] Act and the FCC ruling when it ordered payment of reciprocal compensation for ISP bound calls," and resolution of that question arose under federal law, the district court had § 1331 jurisdiction to resolve that question. *Id.* at 642. Rejecting the argument that § 252(e)(6) of the 1996 Act limits federal jurisdiction to claims defined in that section, the Court concluded that while § 252(e)(6) might not *confer* jurisdiction to hear cases beyond those stated in § 252, it does not *divest* the jurisdiction of actions not specified in § 252 that otherwise might arise under federal law and for which § 1331 provides subject matter jurisdiction. *Id.* In reaching this conclusion, the Court made it clear that federal jurisdiction exists because "resolution of Verizon's claim turns on whether the [1996] Act, or an FCC ruling issued thereunder, precludes the [Maryland] Commission from ordering payment of reciprocal compensation." *Id.* at 643.

The Supreme Court expressly did not decide whether § 252(e)(6) conferred jurisdiction for review of a State commission decision *interpreting or enforcing* an interconnection agreement. *See* 535 U.S. at 642 ("Whether the text of § 252(e)(6) can be so construed is a question we need not decide"). The Court also did not address whether § 1331 would encompass Verizon's claim for review of the PSC's decision based on its alleged *misinterpretation* of the interconnection agreement. *See id.* at 642-44; *see also id.* at 650 n.4 (Souter, J., con-

curring) ("Whether the interpretation of a reciprocal-compensation provision in a privately negotiated interconnection agreement presents a federal issue is a different question which neither the Court nor I address at the present").

On remand from the Supreme Court, the district court relied on § 1331 jurisdiction to resolve Verizon's claim that the 1996 Act and FCC ruling precluded the PSC from ordering reciprocal compensation, entering summary judgment for the PSC on the merits. The court observed that this claim was a "garden-variety federal-preemption claim[]" over which it had jurisdiction under § 1331. *Verizon Md., Inc. v. RCN Telecom Servs,, Inc.*, 248 F. Supp. 2d 468, 476-77 (D. Md. 2003). On Verizon's claim that the PSC *misinterpreted* the contract according to its own terms, however, the district court held that § 252(e)(6) did not create a cause of action over which the federal courts have jurisdiction. The court concluded that Verizon's misinterpretation claim was a "garden-variety contract claim" and that "any question of federal law [was] remote and contingent." *Id.* at 477, 482. Accordingly, it concluded that the claim did not "arise under" federal law as used in 28 U.S.C. § 1331. Having concluded that the contract misinterpretation claim was a State law claim, the district court declined to exercise supplemental jurisdiction under 28 U.S.C. § 1367(a) and dismissed the claim without prejudice. *Id.* at 482-83.

The majority opinion now reverses this latter ruling of the district court, concluding that Verizon's *misinterpretation* claim arises under federal law within the meaning of § 1331. I disagree with that conclusion, and accordingly I respectfully dissent.

### III.   Authority under Section 252(e)(6)

The PSC interpreted the language of the Verizon-MCI contract under Maryland contract law and concluded that when the parties agreed to reciprocal compensation for local traffic, they agreed to reciprocal compensation for ISP-bound traffic. The PSC found that a telephone call to an ISP was a local call and had always been treated as a local call by the parties, by the PSC, and by the FCC. If Verizon did not intend to include ISP-bound calls in the contract for reciprocal compensation, the PSC reasoned, it should have *excluded* ISP-bound calls from the definition of local calls because it was an accepted

industry custom at the time of the agreement to treat ISP-bound calls as local calls.

When Verizon challenged this interpretation in the district court, the court concluded that the issue was a garden-variety contract issue governed by Maryland law and that review of the PSC's order in this regard must proceed from the Commission to State court, not to federal court, consistent with the overall regulatory scheme of the 1996 Act described above. I agree with the district court, and I base my conclusion on two propositions: (1) the misinterpretation claim does not fall within the scope of 47 U.S.C. § 252(e)(6), and therefore federal jurisdiction is not authorized by that provision; and (2) apart from § 252(e)(6), a contract interpretation claim for an interconnection agreement, even though entered into under the mandate of the 1996 Act, does not "arise under federal law," as that phrase is used in 28 U.S.C. § 1331. I address the first point in this Part III, and the second in Part IV.

Verizon contends that its complaint falls within the scope of § 252(e)(6) and that therefore it has stated a *federal* claim cognizable by a federal district court under both that section and under 28 U.S.C. § 1331 (conferring federal-question jurisdiction). While Verizon acknowledges that the express language of § 252(e)(6) limits federal court review under that section to State commission "determinations" to "approve or reject" interconnection agreements, *see* 47 U.S.C. § 252(e)(1), (6), Verizon argues that § 252(e)(6) *impliedly* confers authority on federal courts to review State commission decisions *interpreting and enforcing* such agreements. Thus, it claims that when a State commission misinterprets the language of a negotiated interconnection agreement that it had earlier approved, the State commission, in misinterpreting the interconnection agreement, makes a "determination" as used in § 252, which may be reviewed in federal court pursuant to § 252(e)(6). For support, Verizon relies on decisions from other circuits and an FCC order that in turn relied on other circuits' decisions, even though we have concluded otherwise, holding that the language of § 252(e)(6) does not authorize review of State commission determinations *interpreting and enforcing* interconnection agreements. *See Bell Atl.-Md., Inc. v. MCI WorldCom, Inc.*, 240 F.3d 279, 302-03 (4th Cir. 2001), *vacated on other grounds*, *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 648 (2002).

   In reviewing our decision, the Supreme Court in *Verizon* left open this issue on the scope of § 252(e)(6). But the Court did observe that the State commission determination at issue in this case "is *neither the approval or disapproval* of a negotiated agreement nor the approval or disapproval of a statement of generally available terms," as specified in § 252. 535 U.S. at 641 (emphasis added). In response to Verizon's argument that a determination on the *interpretation and enforcement* of an interconnection agreement is "implicitly encompass[ed]" in § 252, the Court stated that that "is a question we need not decide." *Id.* at 641-42. It limited its holding on review to concluding that § 252 did not *divest* the district court of jurisdiction under § 1331 to review the PSC's order "for compliance with federal law." *Id.* at 642.

   For the reasons we gave in *Bell Atlantic-Maryland*, I thus adhere to the plain meaning of the text of § 252(e)(6) and conclude that, except for the limited "determinations" covered by § 252(e)(6), review of State commission orders are left to review by State courts — an avenue explicitly left in place by the 1996 Act.

   Section 252(e)(6) of Title 47 provides in relevant part:

> In any case in which a State commission makes a determination under this section [§ 252], any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the [interconnection] agreement . . . meets the requirements of section 251 and this section [§ 252].

Because it is clear that this section provides for direct federal court review of State commission "determination[s]" made "under this section [§ 252]," we need only identify what determinations a State commission is authorized to make under § 252 to ascertain the scope of § 252(e)(6)'s review provision.

   Section 251 of Title 47 lifts monopolistic barriers against insurgent or competing telecommunications carriers by mandating interconnection agreements among local carriers and by imposing a duty on carriers to agree to terms that promote seamless service to consumers. Section 251 also directs the FCC to promulgate regulations to imple-

ment the section, at the same time commanding it to preserve State regulations that are consistent with § 251. *See* 47 U.S.C. § 251(d)(3).

Section 252, entitled "Procedures for negotiation, arbitration, and approval of agreements," creates the procedural framework for implementing the commands of § 251. Section 252 defines two separate courses leading to the formation of interconnection agreements — one by negotiation and the other by compulsory arbitration. Agreements arrived at through negotiation must be submitted to the State commission, which "shall approve or reject the agreement, with written findings as to any deficiencies." *Id.* § 252(e)(1); *see id.* § 252(a). But the State commission may only reject a *negotiated* agreement if it finds either that (1) the agreement discriminates against a nonparty telecommunications carrier or that (2) the agreement "is not consistent with the public interest, convenience, and necessity." *Id.* § 252(e)(2)(A). Section 252(e) also permits State commissions to impose State-law requirements in their reviews of interconnection agreements. *See id.* § 252(e)(3). Any party "aggrieved" by a State commission's determination approving or rejecting a negotiated agreement may "bring an action in an appropriate Federal district court" to test the agreement against the requirements of §§ 251 and 252. *Id.* § 252(e)(6). And § 252(e)(4) makes this limited federal review exclusive, stating that "[n]o State court shall have jurisdiction to review the action of a State commission in approving or rejecting an agreement under this section [§ 252]."

If an agreement cannot be reached through negotiation under § 252(a), a party may petition the State commission for compulsory arbitration, setting forth the specific issues upon which agreement cannot be reached. The State commission is directed to arbitrate and resolve the disputed issues, including those raised in the response to the arbitration petition. *See id.* § 252(b)(4). In conducting the arbitration, the State commission is required (1) to ensure compliance with § 251, (2) to establish rates for interconnection services according to standards in § 252(d), and (3) to provide a schedule for implementation of the interconnection agreement. *See id.* § 252(c). Once the disputed issues are thus resolved through compulsory arbitration, the entire agreement is submitted to the State commission for approval or rejection. But unlike an agreement (or portions of an agreement) reached through *negotiation*, where the grounds for rejection by the

State commission are limited to discrimination and inconsistency with the public interest, convenience, and necessity, an *arbitrated* agreement is reviewed by the State commission for compliance with the more comprehensive requirements of § 251 (establishing multiple interconnection requirements) and § 252(d) (establishing pricing standards). That is, arbitrated portions of an agreement are reviewed for compliance with § 252(c)'s standards for arbitrating open terms. *See id.* § 252(e)(2)(B). Finally, as with the State commission's determination approving or rejecting a negotiated agreement, any party "aggrieved" by the State commission's determination approving or rejecting an arbitrated agreement may bring an action in an appropriate federal district court, again "to determine whether the agreement . . . meets the requirements" of §§ 251 and 252. 47 U.S.C. § 252(e)(6).

In sum, § 252(e)(6)'s provision for review of State commission "determination[s] under this section" extends only to determinations to approve or reject negotiated or arbitrated interconnection agreements. The 1996 Act is silent with respect to the administration and enforcement of such approved interconnection agreements. Given the division of responsibility for local telecommunications regulation made under the 1996 Act, including the requirement of § 601(c)(1) (47 U.S.C. § 152 note) that federal responsibility be *expressly* provided for, this silence indicates that States are left with the responsibility of reviewing their own commissions' decisions administering and enforcing interconnection agreements. The States' authority to enforce interconnection agreements stems from the division of responsibility under the 1934 Act, the residual authority under the 1996 Act, and the States' general authority to enforce binding agreements. Because that enforcement authority does not derive from § 252, a State commission's interpretation or enforcement of an interconnection agreement is not performed under § 252. Consequently, § 252(e)(6)'s review provision does not apply to State commission decisions enforcing interconnection agreements.

In this case, Verizon challenges the PSC's order *interpreting and enforcing* interconnection agreements that the PSC previously approved. Verizon does not now challenge any determination made by the PSC under § 252 to approve the agreements. The PSC's authority to interpret and enforce agreements derives from preexisting

Maryland law left in place by the 1996 Act.[3] Because the PSC's order was not a "determination" under § 252, Verizon's challenge to that order does not fall within the scope of federal jurisdiction conferred by § 252(e)(6). For the same reason, Verizon may not rely on *that section* to assert federal question jurisdiction under § 1331.

In support of its position, Verizon points out that the six other circuits to have addressed the source of State commissions' authority to *enforce* interconnection agreements have concluded that it is § 252 that grants such authority and therefore that such enforcement determinations are reviewable in federal court under § 252(e)(6). Further, Verizon also points out that the FCC has construed § 252 to include the *enforcement* of interconnection agreements among State commission responsibilities under the 1996 Act. *See In the Matter of Starpower Communications, LLC Petition for Preemption of Jurisdiction of the Virginia State Corp. Comm'n Pursuant to Section 252(e)(5) of the Telecommunications Act of 1996*, 15 FCC Rcd. 11,277 (2000) (Memorandum Opinion and Order) ("*Starpower Communications*").

To begin with, it is certainly not the *number* of opinions from other circuits that merits our attention, but rather the persuasiveness of their reasoning. Respectfully, I conclude that none of those opinions has adequately considered the text of the 1996 Act and its relationship to the 1934 Act. Those deficiencies remain, no matter how often the opinions cite one another as persuasive authority.

In concluding that State commissions' authority to enforce interconnection agreements derives from § 252, these other circuits rely almost exclusively on one or both of the following arguments: (1)

---

[3]Maryland law appears to confer to the PSC the authority to enforce interconnection agreements, *see* Md. Code Ann., Pub. Util. Cos. § 2-113(a)(1)(ii) ("The Commission shall . . . enforce compliance with the requirements of law by public service companies . . . ."); *id.* § 2-112(b)(2) ("The Commission has the implied and incidental powers needed or proper to carry out its functions under this article"); *id.* § 2-112(c) ("The powers of the Commission shall be construed liberally"). Whether Maryland law does in fact confer such authority to the PSC is not before us. I assume that the PSC did have authority under State law to enforce the interconnection agreements for purposes of my analysis.

*inherent* in State commission authority to *approve or reject* agreements under § 252 is the authority to *interpret and enforce* those agreements; and (2) the FCC has concluded that State commission responsibilities under § 252 include enforcement of agreements, and that interpretation merits deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Neither argument, however, withstands close analysis.

The first argument ("inherent" authority) was initially articulated by the Eighth Circuit in *Iowa Utilities Board v. FCC*, 120 F.3d 753, 804 (8th Cir. 1997), *rev'd in part sub nom. AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999) (emphasis added), where the court stated, "We believe that the state commissions' plenary authority to accept or reject [interconnection] agreements *necessarily* carries with it the authority to enforce the provisions of agreements that the state commissions have approved." Although that statement was the extent of the court's analysis of the issue and the statement appeared in a section of analysis that the Supreme Court later held was not ripe for review, *AT&T*, 525 U.S. at 386, five circuits have cited *Iowa Utilities Board* and adopted the same or a substantially similar statement without providing any further analysis. *See BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1274, 1276 (11th Cir. 2003) (en banc) ("common sense reading");[4] *S.W. Bell*

---

[4]The Eleventh Circuit also finds support for its position in the contrasting language used in §§ 252(e)(4) and (e)(6). It finds instructive that Congress referred to "determination[s]" in (e)(6)'s grant of federal review, yet (e)(4) abrogated State court jurisdiction to reviewing state court actions "approving or rejecting" agreements under § 252. According to the court, "use of the word 'determination' in section 252(e)(6) rather than a specific reference to the approval or rejection of agreements leads us to believe that Congress did not intend to limit state commissions' authority to the mere approval and rejection of agreements." *BellSouth*, 317 F.3d at 1277. But § 252(e)(6) is a *procedural* provision referring to review of State commission determinations made pursuant to authority enumerated elsewhere in § 252, and "[o]ne can hardly conclude . . . that because the 'approve or reject' language is found in sections 252(e)(1) and 252(e)(4) but not section 252(e)(6), this somehow means that state commissions must undertake additional responsibilities besides that which is expressly enumerated in section 252(e)(1)." *Id.* at 1300 n.27

*Tel. Co. v. Brooks Fiber Communications of Okl., Inc.*, 235 F.3d 493, 496-97 (10th Cir. 2000) ("necessarily implies"); *S.W. Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d 942, 946 & n.1 (8th Cir. 2000) ("address[ing] the matter anew" given the Supreme Court's partial reversal of *Iowa Utilities Board*, then concluding that § 252 "necessarily includes the power to enforce [an] interconnection agreement," citing the Fifth Circuit citing *Iowa Utilities Board*); *MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323, 338 (7th Cir. 2000) ("necessarily includes"); *S.W. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 479-80 (5th Cir. 2000) ("necessarily carries with it"). Finding implied authority, however, conflicts directly with § 601(c)(1) of the 1996 Act: "This Act and the amendments made by the Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless *expressly so provided* in such Act or Amendments." 47 U.S.C. § 152 note (emphasis added).

In the Fifth Circuit's opinion (subsequently cited as support in the Seventh, Eighth, Tenth, and Eleventh Circuits' opinions), the court expressed concern that "[u]nder such a narrow construction, [State] commission jurisdiction would not extend to interpreting or enforcing a previously approved contract." *Pub. Util. Comm'n of Tex.*, 208 F.3d at 479. In rejecting that perceived outcome, the court noted that the FCC "plainly expects" State commissions to enforce previously approved interconnection agreements. *Id.* at 480 (citing the 1999 ISP Ruling, 14 FCC Rcd. at 3703-04, ¶¶ 21, 22, 24, *vacated and remanded on other grounds*, *Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1 (D.C. Cir. 2000)). The Fifth Circuit clearly did not contemplate the possibility that State commissions could have authority to enforce interconnection agreements based on residual authority left to the states under the 1996 Act — i.e., the interpretation of the 1996 and 1934 Acts advanced in Part I of this opinion and elsewhere. In fact, none of the circuits considering the source of State commission

---

(Tjoflat, J., dissenting). Further, the Eleventh Circuit makes this argument in the context of its discussion of the FCC's *Starpower Communications* decision and *Chevron* deference, *see id.* at 1277 (emphasis added) ("It is *reasonable* to read the grant of authority in 252(e) as encompassing the interpretation of agreements, not just their approval or rejection"), and I conclude that *Chevron* deference is not due, *see infra*.

authority address, let alone refute, the view that the source of that authority stems from the States' residual authority under the 1996 Act.[5] Under this interpretation, State commissions *would* have authority to enforce interconnection agreements. Therefore, one can avoid the strained construction of § 252 as "necessarily" implying State commissions' authority to enforce interconnection agreements by recognizing the source of such authority in previously established State law.

The more fundamental problem with these opinions' conclusory statements that § 252 authority *to enforce* interconnection agreements "necessarily" follows from § 252 authority *to approve or reject them* is that the contention is clearly false. Logic certainly does not require that the power to make enforcement decisions be conferred by the same statutory provision authorizing approval or rejection determinations, nor that approval and enforcement authority be vested in the same governmental entity. Under its commerce power, Congress could have completely preempted State regulation of local telecommunications participation. *Cf. FERC v. Mississippi*, 456 U.S. 742, 764 (1982). Congress could have vested approval and enforcement authority with the FCC, or Congress could have split authority between the FCC and the federal courts. And, provided it was not commandeering State agencies, Congress could have vested authority to approve and enforce agreements with State public utility commissions or, for that matter, with State boards of cosmetology. Or, as the 1996 Act in fact provides, State commissions could have been invested with authority to approve or reject interconnection agreements, while leaving for the States the decision whether to vest enforcement authority with State commissions or with State trial courts directly (or elsewhere). Thus, although vesting enforcement authority in the same governmental entity that approves interconnection agreements (or conferring such

---

[5]For example, the Eighth Circuit's analysis noted that "[w]hile the arguments of the [appellees] appear to reject the proposition that the state commissions' power to enforce federally-mandated interconnection agreements comes from § 252, they suggest no likely alternative. Arkansas law alone cannot be the source." *Connect Communications*, 225 F.3d at 946. In answer, it is State law plus residual authority under the 1996 Act that constitute the sources of State commission authority to enforce interconnection agreements.

authority by the same statutory provisions) might be one obvious approach, it is certainly not an inevitable or "necessary" arrangement, nor one that "necessarily follows" in a logical sense from vesting approval authority in State commissions through § 252. To the contrary, when considering Congress' purpose of retaining in the overall regulatory scheme the resources and expertise of State commissions and their reviewing courts, it would be more logical to leave authority to administer and enforce local service contracts in State commissions and courts under preestablished State law. This would leave State commissions to function in their traditional role of administering and enforcing agreements relating to local telephone service, while retaining for federal review only decisions governing the formation of interconnection agreements.

The other justification for the conclusion that it is § 252 that vests State commissions with enforcement authority is that the FCC has so concluded and that its decision merits *Chevron* deference. Five other circuits make this argument. *See Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 356 (6th Cir. 2003); *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., Inc.*, 317 F.3d 1270, 1276-77 (11th Cir. 2003) (en banc); *S.W. Bell Tel. Co. v. Brooks Fiber Communications of Okl., Inc.*, 235 F.3d 493, 497 (10th Cir. 2000); *S.W. Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d 942, 946-47 (8th Cir. 2000); *S.W. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 480 (5th Cir. 2000); *see also Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 179 F.3d 566, 573 (7th Cir. 1999) ("[T]he [Illinois Commerce] Commission was doing what it is charged with doing in the [1996] Act and in the FCC ruling [i.e., 1999 ISP Ruling]. It was determining what the parties intended under the [interconnection] agreements"). But, as with the "inherent authority" argument, this argument lacks analysis and is unpersuasive for several reasons.

In its 2000 opinion in *Starpower Communications*, the FCC addressed a request for preemption of the Virginia State Corporation Commission, which declined jurisdiction over a reciprocal compensation dispute concerning the interpretation of an interconnection agreement. 15 FCC Rcd. at 11,277-78, ¶¶ 1, 4. Under § 252(e)(5), the FCC must preempt a State commission's jurisdiction over a matter if the State commission "fails to carry out its responsibility" under § 252.

In the course of its opinion, the FCC concluded that the interpretation and enforcement of previously approved interconnection agreements are within State commissions' § 252 responsibilities. *Id.* at 11,279-80, ¶ 6. The entirety of the FCC's analysis is as follows:

> In reaching this conclusion, we find federal court precedent to be instructive. Specifically, at least two federal courts of appeal have held that inherent in state commissions' express authority to mediate, arbitrate, and approve interconnection agreements under section 252 is the authority to interpret and enforce previously approved agreements. These court opinions implicitly recognize that, due to its role in the approval process, a state commission is well-suited to address disputes arising from interconnection agreements.

*Id.* (footnote omitted). The two circuit court opinions cited by the FCC as "instructive" are *Southwestern Bell Telephone Co. v. Public Utility Commission of Texas*, 208 F.3d 475 (5th Cir. 2000), and *Illinois Bell Telephone Co. v. WorldCom Technologies, Inc.*, 179 F.3d 566 (7th Cir. 1999).

As an initial matter, the FCC's statement that State commissions are well suited to enforce interconnection agreements given the State commissions' role in the approval process does not advance the ball. It must be conceded that *both before and after* enactment of the 1996 Act, State commissions have been not only "well-suited to address" disputes relating to local service agreements, they have done so and continue to do so. State commissions would be equally well suited to enforce interconnection agreements whether the source of that authority is the 1996 Act or residual authority under the 1996 Act (i.e., stemming from the 1934 Act), and the FCC's observation adds nothing to the argument that it is § 252 of the 1996 Act that confers such authority.

Further, not only does *Starpower Communications* fail to analyze the text of § 252 for itself, it also adopts the "inherent-authority" view based on the strength of two circuit court opinions that themselves failed to analyze § 252. The Seventh Circuit made only scattered references supporting such a view in a case only indirectly raising the issue, *see Ill. Bell*, 179 F.3d at 573-74, and the Fifth Circuit, as dis-

cussed above, stated its conclusory view without contemplating the possibility that residual authority under the 1996 Act vested States with enforcement authority, *see Pub. Util. Comm'n of Tex.*, 208 F.3d at 479-80. Those decisions were also based, in part, on deference to the FCC's 1999 ISP Ruling, in which the FCC indicated in dictum that it expected that State commissions would resolve interconnection disputes. 14 FCC Rcd. at 3703-06, ¶¶ 21, 22, 24, 26; *Pub. Util. Comm'n of Tex.*, 208 F.3d at 480; *Ill. Bell*, 179 F.3d at 572-74. The 1999 ISP Ruling, however, was later vacated by the D.C. Circuit. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 6-9 (D.C. Cir. 2000) (vacating based on the FCC's failure to explain why the analysis the FCC used to determine that ISP calls are jurisdictionally mixed was appropriate under the 1996 Act or FCC regulations). Further, the 1999 ISP Ruling revealed only an expectation that State commissions would enforce interconnection agreements, and in only one passing reference did the FCC link that expectation to § 252. *See* 14 FCC Rcd. at 3705-06, ¶ 26 ("In the absence of a federal rule [addressing reciprocal compensation for ISP-bound traffic], state commissions . . . have had to fulfill their statutory obligation under section 252 to resolve interconnection disputes between incumbent LECs and CLECs").

In short, *Chevron* deference is not due to the FCC's conclusion in *Starpower Communications* when it was reached without analyzing § 252 and when it is only based on the persuasiveness of two circuit court opinions that themselves did not analyze § 252 and that relied in part on dicta in a vacated 1999 FCC ruling that also did not analyze § 252.

In addition, *Chevron* deference is not required when the ultimate question is about federal jurisdiction. Analogous to our obligation to inquire *sua sponte* whenever federal jurisdiction is in doubt, *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278 (1977), a federal court must interpret statutory grants of jurisdiction for itself. *See Murphy Exploration & Prod. Co. v. U.S. Dep't of the Interior*, 252 F.3d 473, 478 (D.C. Cir. 2001) ("*Chevron* does not apply to statutes that . . . confer jurisdiction on the federal courts. It is well established that '[i]nterpreting statutes granting jurisdiction to Article III courts is exclusively the province of the courts'" (quoting *Ramey v. Bowsher*, 9 F.3d 133, 136 n.7 (D.C. Cir. 1993))); *see also BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*,

*Inc.*, 317 F.3d 1270, 1304-05 (11th Cir. 2003) (Tjoflat, J., dissenting) (explaining why *Starpower Communications* does not merit *Chevron* deference); *Lopez-Elias v. Reno*, 209 F.3d 788, 791 (5th Cir. 2000) (finding deference to an INS construction of a jurisdictional statute inappropriate because "the determination of our jurisdiction is exclusively for the court to decide").

Finally, *Chevron* deference is not applicable unless the statute construed by the agency is silent or ambiguous. *Chevron*, 467 U.S. at 842-43. Section 252 is not ambiguous. It confers authority on State public commissions to make specific determinations, and those determinations are reviewable in federal court. Otherwise the 1996 Act leaves State commissions the authority they had under the 1934 Act, including the authority to resolve disputes under telecommunications agreements. Because the 1996 Act does not *explicitly* confer authority on State commissions to interpret and enforce previously approved interconnection agreements, § 601(c)(1) of the 1996 Act mandates that the 1934 Act's allocation of such authority to the States remain unmodified. Thus, State law remains the source of State commission authority to enforce local telecommunications agreements and of State court authority to review them. There is no ambiguity. Section 252 has nothing to do with the allocation of enforcement authority for disputes over interconnection agreements. And if I needed to reach *Chevron*'s step two — whether the agency's interpretation is based on a permissible reading of the statute — I would conclude that the FCC's interpretation is not a permissible reading of the statute. In fact, *Starpower Communications* does not qualify as a "reading" of the statute at all. The FCC simply cited two circuit court opinions, which themselves failed to analyze § 252, and simply stated *ipse dixit* that State commissions have "inherent" authority to enforce interconnection agreements based on their approval authority — contrary to § 601(c)(1)'s requirement of express modification of existing law. Although it might be a reasonable alternative to vest State commissions with enforcement authority, that conclusion is not a reasonable interpretation of § 252. *See also BellSouth*, 317 F.3d at 1305 (Tjoflat, J., dissenting) ("I do not think the *Chevron* Court intended that litigants be able to 'launder' circuit court opinions through federal agencies and thereby make those opinions binding on other circuits, even if the agency offers no analysis of its own" (footnotes omitted)).

In addition to concluding that State commission enforcement decisions are not "determinations" that are reviewable in federal court under § 252(e)(6), I also conclude that Verizon's complaint does not properly invoke § 252 because, when it challenges the PSC's "misinterpretation" of Verizon's negotiated agreement, it is not contending that the agreement fails to meet the requirements of §§ 251 and 252, which is the defined scope of § 252(e)(6). A plain reading of § 252(e)(6) indicates a *limited* scope of review. The relevant portion reads in full:

> In any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to *determine whether the agreement or statement meets the requirements of section 251 of this title and this section.*

47 U.S.C. § 252(e)(6) (emphasis added). That is, even if a State commission enforcement decision could be included as a § 252 "determination," § 252(e)(6) provides for federal court review to determine whether the agreement as construed by the State commission violates the requirements of §§ 251 and 252. Section 252(e)(6) does not, in other words, encompass other challenges to a State commission interpretation — such as a claim that a State commission improperly applied State contract law in interpreting the agreement.

The First and Seventh Circuits have adopted this straightforward reading of the text. *See P.R. Tel. Co. v. Telecomms. Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 13-15 (1st Cir. 1999); *MCI Telecomms. Corp. v. Illinois Commerce Comm'n*, 183 F.3d 558, 564 (7th Cir. 1999), *reh'g on other grounds*, 222 F.3d 323 (7th Cir. 2000); *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, 179 F.3d 566, 571 (7th Cir. 1999), *cert. dismissed sub nom. Mathias v. WorldCom Techs., Inc.*, 535 U.S. 682 (2002). Concluding that "[s]ection 252(e)(6) does not confer authority on federal courts to review the actions of state commissions for compliance with state law," the First Circuit noted that "[i]f Congress intended federal courts' review to encompass any kind of alleged legal flaw in a state commission's determination, then there would have been little need to include the language 'meets the

requirements of section 251 . . . and [section 252].'"**[6]** *P.R. Tel.*, 189 F.3d at 13, 14 (quoting 47 U.S.C. § 252(e)(6)) (alterations in original). After discussing how the 1996 Act "exemplifies a cooperative federalism," the court observed that "[i]t would be 'surpassing strange' to preserve state authority in this fashion and then to put federal courts in the position of overruling a state agency on a pure issue of state law." *Id.* at 14-15 (quoting *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999)). The First Circuit acknowledged that it is "perfectly conceivable" that a State commission interpretation of an interconnection agreement based on State law could conflict with § 251 or § 252, and, if so, that decision would be reviewable in federal court. *Id.* at 15.

The Seventh Circuit also interprets the language of § 252(e)(6) to mean what it says. Under § 252(e)(6), the Court has held, "federal courts may review a state commission's actions with respect to an agreement only for compliance with the requirements of § 251 and § 252 of the Telecommunications Act, and not for compliance with state law." *MCI*, 183 F.3d at 564; *see also Ill. Bell*, 179 F.3d at 571. In contrast, "[a] decision 'interpreting' an agreement contrary to its terms creates a different kind of problem — one under the law of contracts, and therefore one for which a state forum can supply a remedy." *Ill. Bell Tel. Co. v. WorldCom Techs., Inc.*, No. 98-3150, 1999 U.S. App. LEXIS 20635, at *1 (7th Cir. Aug. 19, 1999) (unpublished amendment to *Ill. Bell*, 179 F.3d at 574).

Verizon critiques the Seventh Circuit's interpretation of the scope of review under § 252(e)(6) (and simply ignores the First Circuit's interpretation) by insisting that the Fifth, Sixth, Eighth, Ninth, and Tenth Circuits have rejected the Seventh Circuit's view.**[7]** The Eighth

---

**[6]**The First Circuit also concluded that it lacked jurisdiction under § 252(e)(6) because there was an insufficient nexus between the State Board's order and the interconnection agreement, concluding that the order was therefore not a "determination" under § 252. *P.R. Tel.*, 189 F.3d at 9-13. The court's analysis of the scope of review represented an alternative ground for finding that the district court lacked jurisdiction.

**[7]**Verizon also unpersuasively suggests that the Seventh Circuit's *holding* in *Illinois Bell* is "of dubious authority even in that circuit" because of the "plain implication" of scattered language in a later decision that addressed an entirely different question (i.e., State commission immunity under the Eleventh Amendment). *See MCI Telecomms. Corp. v. Ill. Bell Tel. Co.*, 222 F.3d 323 (7th Cir. 2000).

Circuit, however, concluded that jurisdiction was proper because the claim alleged violations of *federal* law, and the court even stated that "[w]ith regard to purely state law issues, the state commissions may have the final say." *S.W. Bell Tel. Co. v. Connect Communications Corp.*, 225 F.3d 942, 948 (8th Cir. 2000). And the Tenth Circuit, although observing that "it would be a waste of judicial resources to limit the court's consideration to federal issues only," concluded that the district court could review State law issues through the exercise of supplemental jurisdiction. *S.W. Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc.*, 235 F.3d 493, 498 (10th Cir. 2000). The Ninth Circuit offered no analysis at all, simply declaring that it would review de novo a State commission's interpretation of an interconnection agreement for compliance with federal law and would consider all other issues under an arbitrary-and-capricious standard. *See US West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir. 1999).

The Fifth and Sixth Circuits acknowledged the issue but in the end concluded without analysis that § 252(e)(6) grants federal courts jurisdiction to review commission determinations for compliance with State law. The Fifth Circuit acknowledged a circuit split, described the Seventh and Ninth Circuits' competing views, and then simply stated that "[w]e find [the Ninth Circuit's] approach appropriate." *S.W. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 481-82 (5th Cir. 2000). The Sixth Circuit acknowledged that § 252(e)(6) allows for federal court review for compliance with §§ 251 and 252, and then, after concluding that a State commission's interpretation of an interconnection agreement is a § 252 determination, the court drew the following conclusion without analysis: "Given that federal courts may review state commission determinations, we join our sister circuits and hold that federal courts have jurisdiction under Section 252 to review state commission interpretations for compliance with state law." *Mich. Bell Tel. Co. v. MCIMetro Access Transmission Servs., Inc.*, 323 F.3d 348, 356-57 (6th Cir. 2003).

Neither Verizon nor the opinions it cites offers any legitimate reason why the scope of federal-court review under § 252(e)(6) is broader than as plainly defined in the text. Thus, I agree with the First and Seventh Circuits that the scope of review under § 252(e)(6) is limited to compliance with §§ 251 and 252. This construction is yet

another reason to conclude that a § 252 determination refers to State commissions' *approval or rejection* decisions — which are subject to §§ 251 and 252 — not to *enforcement* decisions that raise State law issues.

In short, Verizon seeks review of the Maryland Public Service Commission's decision that allegedly misinterprets, under State contract law, the language of a negotiated agreement. This claim does not concern a § 252 determination, and therefore the decision is not reviewable in federal court under § 252(e)(6). Moreover, in alleging that the PSC misinterpreted the terms of the negotiated agreement, Verizon does not contend that this misinterpretation violates § 251 or § 252. Accordingly, for this reason also, its claim does not fall within the scope of review permitted under § 252(e)(6). The district court correctly concluded that the misinterpretation claim is not a federal claim for which federal jurisdiction under § 252(e)(6) is available. Of course, under this construction of § 252, Maryland State courts remain available to review the PSC's orders, as Verizon recognized when it pursued this course the first time it sought review of the PSC's interpretation of its interconnection agreement.

## IV.    Section 1331 Jurisdiction

Verizon also contends that its claim that the PSC misinterpreted Verizon's negotiated agreement with MCI raises a federal question for which the district court had jurisdiction under 28 U.S.C. § 1331 (providing federal district courts with "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States"). In deciding this issue against Verizon, the district court recognized that Verizon was making two distinct claims challenging the PSC's order: (1) that the PSC's order "violates the 1996 Act and FCC rulings issued thereunder by requiring payment of reciprocal compensation for ISP-bound calls"; and (2) that the order "violates the 1996 Act and FCC rulings issued thereunder *by misinterpreting the terms of its agreements* with [MCI] to require payment of reciprocal compensation for ISP-bound calls." *Verizon Md.*, 248 F. Supp. 2d at 476 (emphasis added). The district court understood that it had jurisdiction under § 1331 to decide the first claim, and it granted summary judgment to PSC on the merits of that claim. On the second claim, however, the court declined to exercise supplemental jurisdiction,

concluding that the claim arose under State contract law, not federal law. *Id.* at 487-88.

These rulings by the district court were, I submit, completely consistent with both the Supreme Court's earlier decision in this case and with the "arising under" jurisprudence of § 1331.

While the Supreme Court earlier in this case decided that Verizon's claim *that the PSC's order did not comply with federal law* fell within the district court's § 1331 jurisdiction, the Court did not decide whether Verizon's claim that the PSC *misinterpreted the terms* of its interconnection agreement fell under § 1331 jurisdiction. As the Supreme Court stated:

> [T]he district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another, unless the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous. *Here, resolution of Verizon's claim turns on whether the [1996] Act, or an FCC ruling issued thereunder, precludes the [Maryland] Commission from ordering payment of reciprocal compensation*, and there is no suggestion that Verizon's claim is immaterial or wholly insubstantial and frivolous.
>
> Verizon's claim thus falls within 28 U.S.C. § 1331's general grant of jurisdiction.

*Verizon*, 535 U.S. at 643 (internal quotation marks and citations omitted) (emphasis added). In linking § 1331 jurisdiction to Verizon's claim that the PSC order violated federal law, the Court chose not to address whether § 1331 would also encompass a claim that a State commission *misinterpreted* an interconnection agreement in an enforcement dispute. *See id.* at 642-44; *see also id.* at 650 n.4 (Souter, J., concurring) ("Whether the interpretation of a reciprocal-compensation provision in a privately negotiated interconnection agreement presents a federal issue is a different question which neither the Court nor I address at the present").

Verizon does not argue that the Supreme Court in *Verizon* ruled that its misinterpretation claim arises under federal law. Rather, Verizon argues that its misinterpretation claim arises under federal law based on the general "arising under" jurisprudence of § 1331, advancing three arguments. *First*, it contends that a State commission exercises federal power when enforcing interconnection agreements and that there is a presumption of federal review where an agency wields federal authority in a manner contrary to federal law, such as by misinterpreting an interconnection agreement. *Second*, it contends that because § 252(a)(1) grants local telecommunications carriers the right to enter into "binding" interconnection agreements, federal law is violated when the State commission imposes obligations inconsistent with the stated terms of an agreement. *Third*, it contends that "interconnection agreements are the product of federal legal coercion designed to implement federal statutory obligations" and therefore "any claim based on a 1996 Act interconnection agreement arises under federal law." I address these points in order.

## A

Verizon contends first that the PSC's authority to adjudicate the meaning of the contractual language in the interconnection agreement derives from federal law and that its "claim that the state commission *mis*interpreted the agreement thus constitutes a claim that an agency has wielded federal authority in a manner that is not in accordance with law." As fully articulated in Part I (discussing the division of federal and State responsibility under the 1996 Act), I reject the premise of Verizon's argument. The PSC's authority to adjudicate the case stems from State law, not federal law (i.e., from residual State authority under the 1996 Act). Further, Verizon concedes that review of enforcement decisions is available in State courts (which is in fact the course that Verizon took in response to the PSC's September 1997 order), a fact the Supreme Court also recognized. *See Verizon*, 535 U.S. at 643 (observing that "here the elimination of federal district-court review would not amount to the elimination of all review"). Thus, even if State commissions acted as "federalized" agencies when enforcing interconnection agreements, Verizon's citation to cases such as *Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670 (1986), for the proposition that there is a "strong presump-

tion" that "Congress intends judicial review of administrative action" is inapt.

B

Verizon contends next that, by "requiring Verizon to pay reciprocal compensation on ISP-bound traffic, the PSC acted contrary to the terms of the governing interconnection agreement" and that under the 1996 Act, "a state commission is not permitted to impose obligations inconsistent with [an agreement's] terms." One is tempted to dismiss out-of-hand an argument that federal law is somehow violated when an agency acting in an adjudicatory capacity misinterprets the terms of an agreement between private parties. Yet Verizon characterizes this argument as its "fundamental claim."

Verizon develops this argument as follows. Under § 252(a)(1), an incumbent local carrier "may negotiate and enter into a binding agreement with [a] requesting telecommunications carrier or carriers without regard to the standards set forth in subsections (b) and (c) of section 251 of this title." Verizon contends that "[b]ecause *federal* law dictates that [duly approved] interconnection agreements . . . are binding, a state commission is not permitted to impose obligations inconsistent with their terms." (Emphasis added). When a State commission *mis*construes the terms of a negotiated agreement, Verizon insists, it imposes contrary terms in violation of parties' rights under § 252(a)(1). According to Verizon, "[i]t is, in part, the commissions' lack of power to impose such obligations that gives force to section 252(a)(1)." Verizon contends that its claim therefore arises under federal law because "the PSC's interpretation violates Verizon's federally protected right to enter into 'binding agreement[s]'" (alteration in original).

Verizon makes much of § 252(a)(1)'s reference to "binding agreements," discovering a federally protected "right," but that language hardly represents Congressional intent to federalize all disputes over the terms of an interconnection agreement. The language signifies nothing more than that interconnection agreements, once approved by State Commissions, are binding contracts and that the parties are obligated to perform under the terms of the agreement as interpreted by State commissions (or State courts). Because § 252(a)(1) explicitly

permits parties to negotiate terms without regard to §§ 251(b) and (c), Verizon's argument amounts to a claim that a State commission's misinterpretation of terms voluntarily negotiated *without regard to federal law* somehow violates federal law. Like the district court, I reject Verizon's "read[ing of] the 1996 Act to create a federal cause of action whenever a state commission (mis)determines what parties intended under their interconnection agreements." *Verizon Md.*, 248 F. Supp. 2d at 477.

C

Finally, Verizon contends that "*any* claim based on a 1996 Act interconnection agreement arises under federal law" (emphasis added) because "interconnection agreements are the product of federal legal coercion designed to implement federal statutory obligations" and any approved agreements must be made available, under § 252(i), on the same terms to other requesting local carriers. Although conceding that the 1996 Act grants local carriers "limited flexibility" with respect to the terms of reciprocal compensation arrangements, Verizon insists that federal law is the source of the reciprocal compensation provisions. Under its interpretation, § 1331 is satisfied in the same way that the Supreme Court found jurisdiction in *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682 (1963).[8]

In the typical analysis under § 1331, the inquiry is whether "a well-pleaded complaint establishes either [1] that federal law creates the cause of action or [2] that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 27-28 (1983). In those cases where the federal question

---

[8]Verizon also contends that § 1331 is satisfied because interconnection agreements "serve essentially the same function as, and evince the central attributes of, federal tariffs," which do present claims arising under federal law. *See Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534 (1983) (per curiam). Unlike federal tariffs for interstate telephone services, which carriers formerly had to file with the FCC, interconnection agreements apply primarily within a single State and are approved by *State* commissions, and there is no need for national uniformity in treatment. The analogy fails.

is an element of a State cause of action, "determinations about federal jurisdiction require sensitive judgments about congressional intent, judicial power, and the federal system." *Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 810 (1986). "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction," but rather the inquiry must assess "the *nature* of the federal interest at stake." *Id.* at 813, 814 n.12; *see also Ormet Corp. v. Ohio Power Co.*, 98 F.3d 799, 807 (4th Cir. 1996).

This typical analysis under § 1331 does not, however, readily apply to this case. Although the 1996 Act does not include an express private right of action for the *enforcement* of interconnection agreements (as opposed to § 252(e)(6)'s limited right of action for review of § 252 determinations for compliance with §§ 251 and 252), Congress no doubt expected that interconnection agreements would be enforceable by private action. As the Supreme Court stated in an analogous context, "[t]he issue, then, is not whether Congress intended [parties] to be able to bring contract actions for breaches of the . . . contracts, but whether Congress intended such contract actions to set forth federal, rather than state, claims." *Jackson Transit Auth. v. Local Div. 1285, Amalgamated Transit Union*, 457 U.S. 15, 21 (1982).

In support of its argument that enforcement of a federally mandated agreement arises under federal law, Verizon contends that this case is "indistinguishable" from *International Association of Machinists v. Central Airlines, Inc.*, 372 U.S. 682 (1963), which Verizon characterizes as holding that "disputes regarding federally mandated contracts arise under federal law." *Central Airlines*, however, is readily distinguishable, and its holding is far narrower than Verizon suggests.

*Central Airlines* held that "a suit to enforce an award of an airline system board of adjustment [created pursuant to § 204 of the Railway Labor Act] is a suit arising under the laws of the United States under 28 U.S.C. § 1331." 372 U.S. at 684-85, 696; *see also Jackson Transit*, 457 U.S. at 22 (*Central Airlines* "held that a union had a federal cause of action to enforce an award of an airline adjustment board included in a collective-bargaining contract pursuant to § 204 of the Railway Labor Act"). Under § 204 of the Railway Labor Act, 45 U.S.C. § 184, airline carriers and their employees (through their unions) have a duty to establish a board of adjustment by contract to handle grievances

covered by a collective bargaining agreement. In *Central Airlines*, after the employer refused to honor an award of a contractually established system board, the union sued the employer in federal court to enforce the award.

In addressing whether the suit arose under § 1331, the *Central Airlines* Court concluded that "[t]he contracts and the adjustment boards for which they provide are creations of federal law and bound to the statute and its policy." 372 U.S. at 692. A § 204 contract "is a federal contract and is therefore governed and enforceable by federal law, in the federal courts." *Id.* According to the Court, it is

> federal law which must determine whether the contractual arrangements made by the parties are sufficient to discharge the mandate of § 204 and are consistent with the Act and its purposes. It is federal law which would determine whether a § 204 contract is valid and enforceable according to its terms. If these contracts are to serve this function under § 204, *their validity, interpretation, and enforceability cannot be left to the laws of the many States, for it would be fatal to the goals of the Act* if a contractual provision contrary to the federal command were nevertheless enforced under state law or if a contract were struck down even though in furtherance of the federal scheme.

*Id.* at 691 (emphasis added). The Court emphasized the need for uniformity in the enforcement of a national policy based on the subject matter of interstate air commerce. *Id.* at 691-92 & nn. 15-16. Thus, whether contracts created pursuant to the provisions of § 204 were federal contracts enforceable in federal court was to be determined in light of the Act and its purposes. Reviewing the Act and its purposes, the Court "conclude[d] that when Congress ordered the establishment of system boards to hear and decide airline contract disputes, it intended the Board to be and to act as a public agency, not as a private go-between; its awards to have legal effect, not merely that of private advice." *Id.* at 695 (internal quotation marks and citation omitted). Consistent with the policy of a unified national labor law, the union's complaint to enforce an adjustment board award was held to arise under federal law. *Id.* at 695-96.

But enforcement of privately negotiated interconnection agreements, even though mandated by the Telecommunications Act of 1996, represents a totally different policy, and such contracts are unlike the collective bargaining contracts involved in *Central Airlines*. First, interconnection agreements are required for the purpose of introducing competition into *local* communications markets, and their mandate was part of a cooperative federalism scheme created by the 1996 Act. Moreover, the policy of the 1996 Act is to prefer private contract and deregulation — purposes totally different from those of the Railway Labor Act.

Even though the 1996 Act compels the formation of interconnection agreements, local carriers may voluntarily agree to terms "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1). Thus, the dispute in this case (i.e., whether reciprocal compensation is due according to the terms of the interconnection agreement) does not directly raise an issue of federal law. In fact, given the authority to negotiate terms without regard to federal law, the reciprocal-compensation terms do not raise an issue of federal law in any meaningful way. Indeed, the district court so held in its summary judgment ruling, which Verizon did not appeal. Also, whereas the Court in *Central Airlines* emphasized the importance of uniformity on an issue with a strong and longstanding federal interest (i.e., labor relations affecting interstate transportation), there is no comparable interest with respect to the content of local carriers' reciprocal-compensation provisions. The federal interest is in the formation of interconnection agreements in furtherance of the goal of promoting competition in local telecommunications; any federal interest in private parties' reciprocal-compensation terms is negligible.[9]

---

[9]In response to my observation that the federal interest is negligible, the majority states that a substantial federal interest exists with respect to reciprocal-compensation arrangements and that I have overlooked how important such arrangements are to the federal interest of promoting local competition. *Ante* at 16. This response, however, misses my point altogether. Even though interconnection agreements and reciprocal-compensation arrangements are important to fulfilling the federal interest in promoting local competition, the *content* of those arrangements is not, and 47 U.S.C. § 252(a)(1) makes this explicit. Specifically, as relevant to this dispute, the question of whether ISP-bound calls are compensable

At bottom, *Central Airlines* hardly stands for the proposition advanced by Verizon that all disputes concerning federally mandated contracts arise under federal law.

More analogous to the present case is *Jackson Transit Authority v. Local Division 1285, Amalgamated Transit Union*, 457 U.S. 15 (1982). In that case, the Supreme Court considered whether § 13(c) of the Urban Mass Transportation Act of 1964, 78 Stat. 307 (codified as amended at 49 U.S.C. §§ 5301-5338), permitted a union to sue in federal court for alleged breaches of agreements mandated by that Act. Under that Act, a State or local government seeking federal financial assistance for the acquisition of a privately owned transit company was required to make arrangements to preserve the private transit workers' collective bargaining rights. 457 U.S. at 16. Section 13(c) required the U.S. Secretary of Labor to certify that "fair and equitable" arrangements had been made, including steps to ensure the "preservation of benefits under existing collective-bargaining agreements and the continuation of collective-bargaining rights." *Id.* at 17-18 (internal quotation marks omitted). Thus, when the union sued the City of Jackson, Tennessee, for breach of a mandated § 13(c) agreement that had been approved by the Secretary of Labor, the union invoked federal question jurisdiction to file suit in federal court. The

---

under the Verizon-MCI agreement concerns no federal interest. At the time the parties were negotiating the agreement in this case, neither the federal statute nor any federal regulation addressed ISP-bound calls, and the parties were free to negotiate *any* provision defining how such ISP-bound calls were to be treated. In addition, the contractual interpretation question here does not even relate to whether reciprocal compensation for ISP-bound calls would better promote the federal interest. Rather, it reduces simply to whether the parties reached agreement on treating those calls as local calls eligible for reciprocal compensation. The PSC, applying principles of Maryland contract law, construed the parties' negotiated agreement and found that the parties indeed agreed to treat ISP-bound calls as local calls. The PSC's action thus implicated state contract law, not any federal interest identified by the majority.

In missing my point, the majority, I respectfully submit, continues to advance its underlying thesis that avoids the more particularized analysis necessary to determine when the interpretation of a federally mandated contract implicates § 1331 jurisdiction and when it does not.

Supreme Court, reversing the court of appeals, held that the district court did not have federal question jurisdiction.

The Supreme Court observed that cases such as *Central Airlines* "demonstrate that suits to enforce contracts contemplated by federal statutes *may* set forth federal claims and that private parties in appropriate cases *may* sue in federal court to enforce contractual rights created by federal statutes," but that "the critical factor is the congressional intent behind the particular provision at issue." *Id.* at 22 (emphases added). Suits alleging breaches of agreements that are "creations of federal law" will state federal claims only if "the rights and duties contained in those contracts [are] federal in nature." *Id.* at 23 (internal quotation marks omitted). Acknowledging that § 13(c) explicitly specifies protective provisions that any such arrangements must include, the Supreme Court nevertheless held that, according to the legislative history, Congress intended that State law govern the labor relations between local governments and transit workers and that § 13(c) not disturb the statutory exemption from the National Labor Relations Act that applied to local governments and their employees. *Id.* at 23-28. Based on the legislative history, the Court also rejected the "anomalous" "possibility that Congress might have intended a federal court to hear the union's claims, but to apply state law." *Id.* at 28 n.11.

Like the statutory provisions at issue in *Jackson Transit*, the 1996 Act reveals a congressional intent that alleged breaches of the federally contemplated agreements be heard by State courts applying State law. The Court in *Jackson Transit* reached that conclusion even though the alleged breach concerned the very rights protected by federal law (i.e., the guarantee of collective bargaining rights). By contrast, the dispute in this case concerns contract terms agreed to without regard to federal law requirements. *See* 47 U.S.C. § 252(a)(1). Moreover, the cooperative-federalism scheme created by the 1996 Act reveals congressional intent to limit federal reach into areas traditionally regulated by states.

Although the 1996 Act dramatically changed the regulation of local telecommunications, Congress did so in a way that carefully circumscribed federal regulation of this traditionally State-regulated area. *See* Part I, *ante*. The 1996 Act amended the 1934 Act, but left in place

much of the structure of the 1934 Act. The 1996 Act, for example, did not repeal 47 U.S.C. § 152, which divides responsibility for regulation of interstate and intrastate telecommunications between the FCC and the States, respectively. And § 601(c)(1) of the 1996 Act provides that the Act "shall not be construed to modify, impair, or supersede Federal, State, or local law *unless expressly so provided* in such Act or amendments." 47 U.S.C. § 152 note (emphasis added). The Supreme Court has observed that, because the 1996 Act has extended federal regulation into local competition, § 152 "may have less practical effect." *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 381 n.8 (1999). But, the Court added, "[i]nsofar as Congress has remained silent, . . . § 152(b) continues to function." *Id.* The 1996 Act also explicitly preserves State authority to enforce existing, and impose additional, State regulations on local carriers provided that the regulations are not inconsistent with the 1996 Act. 47 U.S.C. § 261. The local-competition provisions themselves emphasize that State commissions retain authority to impose competitively neutral State law requirements. *Id.* § 252(d)(3). The 1996 Act, therefore, evinces congressional intent to take away as little State authority as possible in its effort to promote local competition in telephone service.

Despite the 1996 Act's carefully circumscribed role for federal regulation of local telecommunications, Verizon contends that *all* disputes concerning interconnection agreements may be brought in federal court. If Verizon's argument is accepted, a dispute concerning terms that have nothing to do with federal law or regulations could nevertheless be brought in federal court. Competitively neutral terms imposed by State law, pursuant to § 252(d)(3), for example, would arise under federal law and could be brought before federal courts applying State law. Even a dispute over the date reciprocal-compensation payments are due, according to Verizon's argument, would raise a federal question. I agree with the First Circuit that "[i]t would be 'surpassing strange' to preserve state authority in this fashion [under the 1996 Act] and then to put federal courts in the position of overruling a state agency on a pure issue of state law." *P.R. Tel. Co. v. Telecomms. Regulatory Bd. of Puerto Rico*, 189 F.3d 1, 15 (1st Cir. 1999) (quoting *AT&T*, 525 U.S. at 378 n.6).

The same is true for terms in a voluntarily negotiated interconnection agreement generally, especially given that the 1996 Act permits

local carriers to agree to terms "without regard to the standards set forth in subsections (b) and (c) of section 251." 47 U.S.C. § 252(a)(1).[10] The federal interest in promoting local competition is focused on the *formation* of interconnection agreements that comply with §§ 251 and 252. Thus, Congress designed the provisions of §§ 251 and 252 to enlist State commissions to mediate, arbitrate, and approve or reject interconnection agreements. Section 252(e)(6) provides for federal review of those determinations to ensure compliance with §§ 251 and 252. The 1996 Act, however, is completely silent about the *enforcement* of interconnection agreements, which, based on the Act's cooperative-federalism scheme, indicates that such disputes are to be resolved by the States. Once approved, interconnection agreements are binding agreements with contractual rights and duties to be enforced according to State contract law in State commissions and courts. The federal interest in the content of local carriers' voluntarily negotiated reciprocal-compensation terms is negligible. Congress did not intend for disputes over the interpretation of voluntarily negotiated interconnection agreements to be heard in federal courts.

Finally, although its briefs submitted on this appeal do not directly present the argument (other than through a few scattered and incomplete references), one could read Verizon's scattered references as arguing, as it did below and as the majority does, that the parties intended that the reciprocal compensation arrangements in the interconnection agreements "track" federal law and that, therefore, § 1331 is satisfied. As an initial matter, the agreement certainly does not expressly indicate an intention to track federal law, and whether the parties did in fact intend to track federal law would be resolved by principles of Maryland contract law. Further, that private parties gratuitously incorporate federal law into an agreement does not change the fact that the terms are privately negotiated, and federal law exerts no independent force over the parties. Even if the parties agreed to track federal law, that gratuitous incorporation of federal law would

---

[10]The majority finds it significant that § 251(b) imposes a duty on local carriers to establish reciprocal-compensation terms. *Ante* at 14-15. Verizon's complaint, however, is not that no reciprocal-compensation terms have been agreed to, but that the PSC misinterpreted the agreed-upon terms — which, under § 252(a)(1), the parties could negotiate without regard to federal standards.

not create jurisdiction under § 1331. *See Mabe v. G.C. Servs. Ltd. P'ship*, 32 F.3d 86, 88 n.2 (4th Cir. 1994) ("A private contract cannot create federal question jurisdiction simply by reciting a federal statutory standard"); *Oliver v. Trunkline Gas Co.*, 796 F.2d 86, 89-90 (5th Cir. 1986) ("[W]e are aware of no case in which any court, let alone the Supreme Court, has held that a *private* contract can give rise to federal-question jurisdiction simply by 'incorporating' some federal regulatory standard that would not have been binding on the parties by its own force").

Accordingly, Verizon's claim that the PSC misinterpreted the privately negotiated reciprocal-compensation terms of its interconnection agreements does not present a federal question for purposes of jurisdiction under § 1331.

## V.   Conclusion

For the foregoing reasons, I would affirm the district court's judgment across the board, and therefore I dissent from the majority's conclusion that when a State commission interprets a negotiated interconnection agreement under principles of State contract law, a claim challenging that interpretation arises under federal law.